COMMONWEALTH vs. VINCENT DiGERONIMO.

No. 94-P-630.

Worcester. January 4, 1995. - July 13, 1995.

Present: DREBEN, GILLERMAN, & LAURENCE, JJ.

*Practice, Criminal*, Assistance of counsel. *Search and Seizure*, Exigent circumstances, Emergency. *Constitutional Law*, Search and seizure. *Intoxication. Motor Vehicle*, Operating under the influence.

Statement of the law of warrantless entry and the "emergency" exception to the warrant requirement. [720-723]

The record of a criminal trial did not demonstrate that a police officer had specific and articulable facts to support a reasonable belief that the defendant was in distress and in need of immediate assistance to justify the officer's warrantless entry into the defendant's apartment. [723-725]

The record of a criminal trial did not support the conclusion that a police officer properly made a warrantless entry of the defendant's apartment to prevent the imminent destruction or removal of incriminating evidence of the defendant's inebriation. [725-729]

The judge at a criminal trial erred in denying the defendant's motion for a new trial on the ground of ineffective assistance of counsel, where trial counsel's failure to have filed a motion to suppress evidence seized by police as a result of an unlawful warrantless entry into the defendant's apartment likely deprived the defendant of a substantial ground of defense. [729-731]

COMPLAINT received and sworn to in the Leominster Division of the District Court Department on March 18, 1993.

On transfer to the jury session of the Fitchburg Division, the case was tried before *Vito A. Virzi*, J., and a motion for a new trial was heard by him.

*John A. Bosk* for the defendant.

*James P. McKenna*, Assistant District Attorney, for the Commonwealth.

LAURENCE, J. The underlying issue in this case is the validity of a warrantless police entry into the private residence

of a suspected drunk driver who had recently caused an accident. As a result of that entry, the police obtained overwhelmingly incriminating evidence that led to the conviction of Vincent DiGeronimo for operating his vehicle under the influence of intoxicating liquor.

*Background facts.*[1] In Leominster on St. Patrick's Day evening, 1993, snow and misty rain covered the roads in a dark sheen of ice. At approximately 10:30 P.M., DiGeronimo was operating his four-wheel drive Jeep Wagoneer on North Street. He was bringing a corned beef sandwich from Donnelly's Tavern to his invalid mother, whom he had been visiting. At the tavern, he had ordered at least two beers as he waited for the food to be prepared. While traveling at an excessive rate of speed, DiGeronimo rammed the rear of a vehicle being driven by Paul Eagan. Eagan had stopped at the bottom of a hill on North Street because of difficulties that cars ahead of him were having negotiating the slippery incline. The impact of the collision broke Eagan's seat and pushed his car more than thirty feet up the hill, spinning it around and dumping Eagan into his rear seat.

Neither driver was physically injured. Eagan's car was, however, inoperable. DiGeronimo got out of his car and staggered toward Eagan's car. (At trial, DiGeronimo attributed his difficulty walking to the icy conditions.) Eagan observed that DiGeronimo was unsteady on his feet, nervous, and agitated in an angry manner. DiGeronimo was also speaking in so slurred a fashion that Eagan could not understand him. Eagan quickly concluded that DiGeronimo was drunk. Two passersby said that they would notify the police. Eagan then noticed DiGeronimo getting back into his car and driving off without turning on his headlights. (DiGeronimo testified that they had been broken as a result of the collision.) Eagan took down the vehicle's license plate number.

DiGeronimo drove to his apartment, which was in a building only a short distance away. His car's crumpled front fender had by this time so gouged his tire that he could no

---

[1]The facts are taken from the District Court judge's findings and uncontested testimony.

longer move the vehicle. From his apartment, he telephoned the police station to report the accident. During the conversation, DiGeronimo used obscenities, and his speech was slurred.[2] He then waited in his apartment because he thought the police might be coming to question him.[3] After a while, he ate the corned beef sandwich, drank (so he testified) one or two glasses of wine, turned on the television, and fell asleep in a chair in front of the television set.

Meanwhile, a police cruiser had arrived at the accident scene. It was followed, at approximately 10:45 P.M., by uniformed Leominster police officer Deshod (or Ducharm — the record is inconsistent), who had received a radio report of the accident. After observing the scene and speaking with Eagan (who opined that the driver who had rear-ended him had been drunk), Deshod called the police station to "run" the license plate of the other car, which Eagan had given him. Deshod was soon informed of DiGeronimo's ownership of the suspect vehicle and nearby address. He remained at the scene for approximately fifty minutes until the road, which was still slippery, was salted, and Eagan's car was towed. At this point (so the judge found), the officer had probable cause to believe DiGeronimo had been operating a motor vehicle under the influence of alcohol.

At approximately 11:35 P.M., Deshod drove to the address he had been given. He found the car described by Eagan parked in front of the apartment building. He was allowed entrance into the common hallway of the building by a security guard and proceeded to DiGeronimo's apartment, accompanied by the guard. There he knocked repeatedly and vigorously on the door for several minutes, announcing as loudly as he could that he was a police officer. No response came from within, but Deshod could hear the sound of a television set through the door. Deshod concluded (in good

---

[2]The tape recording of DiGeronimo's telephone call to the police was played for the jury but is no longer available. There is no evidence in the record indicating that DiGeronimo also called his invalid mother, who was presumably waiting for both him and the corned beef sandwich.

[3]It is unclear from the record whether DiGeronimo gave the police his name and address when he called.

faith, the judge found) that DiGeronimo was inside and possibly in need of assistance.[4] He radioed the police station and asked the dispatcher to call DiGeronimo's number. The dispatcher reported receiving a busy signal. Deshod next asked his patrol supervisor whether he should enter the apartment "to check on the welfare of the owner of the second vehicle." Upon being told he should, he entered the apartment, using the security guard's passkey,[5] and immediately identified himself as a police officer.

Deshod saw DiGeronimo sitting in a chair in front of the television set in his underwear. DiGeronimo (who testified that the opening of the door wakened him) looked at Deshod in surprise and stood up. Deshod told DiGeronimo to put some clothes on. As DiGeronimo walked about the room, Deshod noticed that he was unsteady on his feet and swayed. As DiGeronimo approached after getting dressed, Deshod detected a strong odor of alcohol on his breath and observed that his eyes were bloodshot and glassy. Deshod asked DiGeronimo if he had been involved in an accident. In slurred but comprehensible speech, DiGeronimo responded affirmatively, stating that the vehicle he struck had "backed down the hill" into him. Deshod then asked if DiGeronimo had been drinking. DiGeronimo said he had drunk two beers

[4]The judge also found that Deshod believed that DiGeronimo was "refusing to acknowledge the officer," but nothing in the record supports this finding or the conclusion that part of Deshod's motivation in entering DiGeronimo's apartment was "to determine if he was under the influence and was avoiding detection."

[5]The security guard, who did not enjoy common or joint access, use, or control of the apartment with DiGeronimo, had no authority to consent to a warrantless entry or search. See *Chapman* v. *United States*, 365 U.S. 610, 617 (1961); *Stoner* v. *California*, 376 U.S. 483, 489 (1964); *United States* v. *Matlock*, 415 U.S. 164, 171 & n.7 (1974). No argument was made below that DiGeronimo's telephone call to the police and his apparent expectation that the police might arrive to question him, constituted implied consent to the eventual police entry. We do not, therefore, address the issue, but note that the few cases that have recognized such implied consent involved murder investigation scenarios in which the guilty defendant notified the police in an apparent effort to throw them off his trail. See *Commonwealth* v. *Beldotti*, 409 Mass. 553, 555-556 (1991). See also *State* v. *Fleischman*, 157 Ariz. 11 (1988); *Brown* v. *State*, 856 S.W.2d 177 (Tex. Ct. App. 1993).

at Donnelly's. Deshod saw no bottles, glasses, or containers of any sort in the apartment, and DiGeronimo unsolicitedly stated that there was no alcohol anywhere in the apartment. At some point DiGeronimo turned and left without explanation to go to the bathroom.

Deshod concluded from his observations that DiGeronimo was under the influence of alcohol, placed him under arrest, handcuffed him, and transported him to the police station. After being booked for operating under the influence and being advised of his rights, DiGeronimo elected to take a breathalyzer test. The test yielded two reliable readings of 0.15, well above the blood alcohol level that leads to license suspension under G. L. c. 90, § 24N. During the booking and testing procedure, two officers watched DiGeronimo for more than twenty minutes and noted the strong odor of alcohol on his breath, the unsteadiness of his gait, and the glassy redness of his eyes.

Ultimately charged with the misdemeanor of operating under the influence, second offense, DiGeronimo was found guilty after trial before a jury of six in November, 1993. He was sentenced to two years in the Worcester County house of correction, with nine months to serve and the balance suspended. In February, 1994, he filed a late notice of appeal and a motion for a new trial, arguing that he had received ineffective assistance from trial counsel because of counsel's failure to file a motion to suppress all evidence obtained from and after the illegal police entry into his apartment.

After a hearing, the trial judge denied the new trial motion. He ruled that Officer Deshod had probable cause to believe that DiGeronimo had been responsible for a motor vehicle accident while driving under the influence of alcohol. The judge also found that exigent circumstances existed to validate Deshod's warrantless, but restrained and peaceable, entry into the apartment. Those circumstances were (a) the need to check whether DiGeronimo might be injured as a result of the accident, and (b) the need to determine whether he was under the influence of alcohol, a determination that might have been frustrated by delays caused by DiGer-

onimo's apparent attempt to avoid detection and necessarily attendant to police efforts to obtain a warrant. The judge concluded that any motion to suppress would, therefore, have been denied, so that trial counsel's failure to have made such a futile motion could not be faulted.

*Summary conclusion.* DiGeronimo has reiterated on appeal his "ineffective assistance" contentions based on the failure of counsel to file a suppression motion. While recognizing both the good faith — indeed, the commendable intent — of the police in this case, as well as the deplorable social problem caused by "the continuing slaughter upon our Nation's highways, a good percentage of which is due to drivers who are drunk," *Welsh* v. *Wisconsin,* 466 U.S. 740, 755 (1984) (Blackmun, J., concurring), we are constrained to agree with DiGeronimo. The warrantless police entry into his apartment was presumptively illegal, and in the circumstances, fell within no recognized exception to the constitutional warrant requirement. A motion to suppress the evidence improperly obtained from that entry, upon which DiGeronimo's conviction was substantially based, should have succeeded. Trial counsel's failure to file such a motion very likely deprived DiGeronimo of a substantial ground of defense.[6] His conviction must therefore be reversed.

---

[6]The standard for evaluating a claim of ineffective assistance of counsel is based upon the two-part test classically described in *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974): "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." In practice, the ineffectiveness determination frequently emanates from a one-factor analysis. The focus of appellate consideration is on the "prejudice" rather than the "performance" prong of the test: i.e., whether, on the basis of facts known to or reasonably ascertainable by the defendant's counsel, counsel might have acted in a manner that could have afforded the defendant a substantial ground of defense, such that the counsel's failing so to act was "manifestly unreasonable." See, e.g., *Commonwealth* v. *Rondeau,* 378 Mass. 408, 413 (1979); *Commonwealth* v. *Harris,* 387 Mass. 758, 762 (1982); *Commonwealth* v. *Griffith,* 404 Mass. 256, 262 (1989); *Commonwealth* v. *Montanez,* 410 Mass. 290, 295 (1991); *Commonwealth* v. *Medina,* 20 Mass. App. Ct. 258, 259 (1985); *Commonwealth* v. *Garcia,* 34 Mass. App. Ct. 386, 391 (1993). (Indeed, the United

*The law of warrantless entry.* The law applicable to the issue at hand is well established but, as our Declaration of Rights admonishes,[7] warrants periodic recapitulation:

> " 'It is clear . . . that the notion that the warrantless entry of a man's house in order to arrest him on probable cause is per se legitimate is in fundamental conflict with the basic principle of Fourth Amendment law that *searches and seizures inside a man's house without warrant are per se unreasonable in the absence of some one of a number of well defined "exigent circumstances."* ' [*Coolidge* v. *New Hampshire*, 403 U.S. 443, 477-478 (1971).] *The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amendment was designed to circumscribe* by the general requirement of a judicial determination of probable cause. . . . The distinction between an entry to search and an entry to arrest is slight, for the latter may well be characterized as simply a search for a person rather than a search for things. . . . Moreover, it can be argued that an entry to arrest is a far greater intrusion than an entry to search.

States Supreme Court has indicated that courts need not evaluate counsel's performance at all when they can determine ineffective assistance claims on the ground of prejudice alone. *Strickland* v. *Washington*, 466 U.S. 668, 697 [1984].) When the record reveals that, notwithstanding an over-all high quality of work at trial, defense counsel's conduct or failure to act in a particular instance was so serious a lapse as to enhance significantly the chance of a defendant's conviction, then the defendant's burden under the ineffective assistance test is satisfied. See *Commonwealth* v. *Rossi*, 19 Mass. App. Ct. 257, 259-260 (1985); *Commonwealth* v. *Frisino*, 21 Mass. App. Ct. 551, 555-556 (1986). Consequently, our analysis concentrates on whether the warrantless police entry, which produced the bulk of the incriminating evidence against DiGeronimo, was so vulnerable to challenge by means of a motion to suppress that DiGeronimo's counsel's failure to file the motion was manifestly unreasonable, notwithstanding counsel's otherwise able representation.

[7]"A frequent recurrence to the fundamental principles of the constitution . . . [is] absolutely necessary to preserve the advantages of liberty, and to maintain a free government." Massachusetts Declaration of Rights, art. XVIII.

*Coolidge* v. *New Hampshire, supra,* at 479-480. The exigencies which would excuse the lack of an arrest warrant may differ from those supplying the excuse for the lack of a search warrant. *In any event, the police are required to demonstrate that exigency.* In short, we believe that the Fourth Amendment prohibits a warrantless entry into a dwelling to arrest in the absence of sufficient justification for the failure to obtain a warrant. . . ." (Emphasis supplied.)

*Commonwealth* v. *Forde,* 367 Mass. 798, 804-806 (1975).[8] The circumstances that have been recognized as justifying failure to obtain a warrant have been severely circumscribed by the courts as being both few, *Katz* v. *United States,* 389 U.S. 347, 357 (1967), and exceptional, *G.M. Leasing Corp.* v. *United States,* 429 U.S. 338, 352-353, 358 (1977). The Supreme Court of the United States has also observed that the few exceptions are "jealousy and carefully drawn," *Jones* v. *United States,* 357 U.S. 493, 499 (1958), and that the government's "heavy burden" in such cases, *Welsh* v. *Wisconsin,* 466 U.S. at 749-750, is to show that, even within the few, narrow exceptions, proceeding without a warrant was "imperative." *McDonald* v. *United States,* 335 U.S. 451, 456 (1948).

---

[8]The Commonwealth is free to develop its own law of search and seizure under art. XIV of our Declaration of Rights (insuring the "right to be secure from all unreasonable searches and seizures") to meet the needs of local law enforcement. *Commonwealth* v. *Matthews,* 355 Mass. 378, 380 (1969). However, the Commonwealth may not "authorize police conduct which trenches upon Fourth Amendment rights." *Sibron* v. *New York,* 392 U.S. 40, 61 (1968). Consequently, the validity of warrantless entries and arrests is typically evaluated, as the parties have here acknowledged and as our jurisprudence reflects, by Fourth Amendment standards as enunciated by the Federal courts, particularly since a warrantless intrusion that falls afoul of the Fourth Amendment will certainly violate the presumptively more stringent requirements of art. XIV. See *Selectmen of Framingham* v. *Municipal Ct. of the City of Boston,* 373 Mass. 783, 787-788 (1977); *Commonwealth* v. *Ortiz,* 376 Mass. 349, 358 (1978); *Commonwealth* v. *Douzanis,* 384 Mass. 434, 437 n.7 (1981); *Commonwealth* v. *Assad,* 393 Mass. 418, 422-423 (1984); *Commonwealth* v. *Ford,* 394 Mass. 421, 426 (1985).

The Supreme Judicial Court has underscored the necessity, within these stringent Fourth Amendment guidelines, of subjecting warrantless searches of private residences to strict constitutional scrutiny. The government has the heavy burden of clearly demonstrating an urgent need to effect entry in the particular case even within a recognized category of exceptional circumstances. *Selectmen of Framingham* v. *Municipal Ct. of the City of Boston*, 373 Mass. 783, 785-786 (1977).

*The "emergency" exception to the warrant requirement.* The judge below and the Commonwealth here have relied upon two of the narrow exceptions that have been recognized by the courts[9] to justify the warrantless police breach of DiGeronimo's castle.[10] The first is the so-called "emergency" doctrine, which authorizes warrantless entry when a police officer (or other public safety official) reasonably believes that a person within the dwelling is in need of immediate

---

[9]*Commonwealth* v. *Skea*, 18 Mass. App. Ct. 685, 693 n.12 (1984), provides a convenient summary of the exceptions, only two of which are urged upon us here. Each accepted exigency requires, as a precondition to sanctioning the warrantless activity, that the police have probable cause to believe that the defendant has committed a crime, see *id.* at 692-693, 695; *Commonwealth* v. *Pietrass*, 392 Mass. 892, 897 (1984), unless it is a "pure" emergency where entry was effected solely to avert a dangerous situation that threatened life or safety, in which case any incriminating evidence within plain view may legitimately be seized. *Commonwealth* v. *Marchione*, 384 Mass. 8, 12 (1981). We agree with the judge that Officer Deshod had probable cause to believe that DiGeronimo had been operating a motor vehicle under the influence of alcohol, based upon the observed circumstances of the accident, the information provided by Eagan, and DiGeronimo's telephone call to the police. Cf. G. L. c. 90, § 21 (authorizing a police officer to arrest without a warrant any person who the officer has probable cause to believe has operated a motor vehicle under the influence, whether or not the offense was committed in the officer's presence). Probable cause to arrest, however, does not alone legitimate warrantless entry into the suspect's home to effect the arrest in the absence of consent or a showing of recognized exigent circumstances. See *Welsh* v. *Wisconsin*, 466 U.S. at 748 n.9, 749 & n.11.

[10]The home as a citizen's metaphoric castle and refuge has been an axiom of our common law for almost four centuries. See *Semayne's Case*, 77 Eng. Rep. 194 (K.B. 1604) ("[T]he house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose").

assistance because of an imminent threat of death or serious injury, or that prompt intervention is necessary to prevent a threatened fire, explosion, or other destructive accident. See *Commonwealth* v. *Marchione*, 384 Mass. 8, 11-12 (1981); *Commonwealth* v. *Bates*, 28 Mass. App. Ct. 217, 219-220 (1990); *Commonwealth* v. *Hurd*, 29 Mass. App. Ct. 929, 930 (1990).[11]

Police action in such situations is to be viewed under a reasonableness standard in light of the circumstances in the field, not by "Monday morning quarterbacking."[12] Nonetheless, we fail to find in this record the requisite compelling reasons, supported by specific and articulable facts, see *Mincey* v. *Arizona*, 437 U.S. 385, 392-394 (1978), that could have led officer Deshod reasonably to believe that DiGeronimo was in dire, life-threatening distress and in need of immediate assistance.

Eagan did not tell Deshod that DiGeronimo was injured, only that he appeared drunk. Eagan himself revealed that he was uninjured. DiGeronimo's driving off from the accident scene suggested lack of incapacitating injury. DiGeronimo's telephone call to the police gave no hint that he was ailing, only profane and possibly inebriated. Deshod's lingering at the accident scene for almost an hour, knowing that DiGeronimo lived only yards away and with a police cruiser standing nearby, reflected a belief that no pressing reason required prompt attention to DiGeronimo.

---

[11]There is a question as to the applicability of the emergency exception in this case, since several authorities have indicated that it cannot be invoked when the entry was also motivated by an intent to discover incriminating evidence, which the judge explicitly attributed to the police here. See *Commonwealth* v. *Cricones*, 12 Mass. App. Ct. 953, 954 (1981); *Commonwealth* v. *Bates*, 28 Mass. App. Ct. at 219. Since we conclude that this exception is unavailable to sustain the entry in the instant circumstances, we need not resolve the question.

[12]"[W]hether an exigency existed, and whether the response of the police was reasonable and therefore lawful, are matters to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis." *Commonwealth* v. *Young*, 382 Mass. 445, 456 (1981).

No alarming signs confronted Deshod as he stood outside DiGeronimo's apartment (such as a trail of blood, *Commonwealth* v. *Young*, 382 Mass. 445, 454, 457 [1981]; shots heard from within, *Mincey* v. *Arizona*, 437 U.S. at 387; moaning sounds coming from inside, *Commonwealth* v. *Kingsbury*, 7 Mass. App. Ct. 51, 53-54, *S.C.*, 378 Mass. 751 [1979]; a badly wounded person on the threshold, *Commonwealth* v. *Cricones*, 12 Mass. App. Ct. at 953-954; or flammable and explosive materials on the floor, *Commonwealth* v. *Marchione*, 384 Mass. at 12). Although DiGeronimo's telephone was reported to be emitting a busy signal, no effort appears to have been made to determine whether it was the signal of a telephone being used or of one off the hook. When Deshod ultimately gained entry into the apartment, he made no inquiry whether DiGeronimo was injured or required assistance, only whether DiGeronimo had been involved in an accident. Deshod's initial command to DiGeronimo to dress himself implicitly assumed DiGeronimo's ability to do so.

Finally, the record contains no evidence suggesting that either Deshod or his supervisor ever considered, let alone reasonably concluded, that obtaining a warrant (which is available "at any time," G. L. c. 218, § 35; G. L. c. 276, § 3A, as amended by St. 1962, c. 328, from an after-hours duty judge or a magistrate on call, either directly or through the State police) would entail so great a delay as to increase any apprehended danger to DiGeronimo's life or limb. See *Commonwealth* v. *Bates*, 28 Mass. App. Ct. at 221. Contrast *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 256 (1982) (Where, in the circumstances of that case, "the Commonwealth ha[d] shown, as required by our cases, that it was impracticable for the police to obtain a warrant"). Indeed, as just discussed, the known facts surrounding the accident indicate that no such consideration could reasonably have entered into their calculations.

In sum, Deshod's subjective good faith belief that DiGeronimo might be in need of assistance did not justify either the entry or the subsequent search and arrest. See *Illinois* v. *Rodriguez*, 497 U.S. 177, 185 (1990), quoting from *Hill* v.

*California*, 401 U.S. 797, 803-804 (1971). The objective circumstances did not reasonably support a genuine concern on Deshod's part that DiGeronimo might have been so severely injured in the accident as to be in a life-threatening situation requiring immediate, warrantless entry and assistance. The judge's finding in that respect was clearly erroneous. The circumstances presented to the officer were not remotely analogous to the factual urgencies of the cases in which the emergency exception has been held to apply.[13]

*The "destruction of evidence" exception to the warrant requirement.* The only other exception cited by the judge and

---

[13]Contrast *Commonwealth* v. *Young*, 382 Mass. at 454-457 (police entered after discovery of brutally murdered body in basement and trail of blood leading to the entered apartment, where they believed the suspect was lurking); *Commonwealth* v. *Marchione*, 384 Mass. at 9-12 (entry justified where building owner discovered that defendant tenant's cellar floor was covered with fuel oil and that gasoline was stored in open containers near a homemade incendiary device and oil burner); *Commonwealth* v. *Paniaqua*, 413 Mass. 796, 797-798 (1992) (entry lawful into apartment from which police reasonably believed gunshots had been fired into a public area moments before); *Commonwealth* v. *Kingsbury*, 7 Mass. App. Ct. at 54 (forced entry justified when officers searching for a missing teenager heard moaning sounds coming from suspect's apartment); *Commonwealth* v. *DiSanto*, 8 Mass. App. Ct. 694, 696-698 (1979) (entry lawful into apartment of persons suspected of just committing armed robbery and murder and who were believed to possess several weapons, including a submachine gun); *Commonwealth* v. *Fiore*, 9 Mass. App. Ct. 618, 620 (1980) (where the dwelling had obviously been broken into, entry was justified in order to avert the possibility of danger to an occupant from the continued presence of the intruder); *Commonwealth* v. *Cricones*, 12 Mass. App. Ct. at 954 (search of upstairs of house where police found a severely wounded man justified based on witness who had called for help having muttered "upstairs," indicating either the presence of the perpetrator or other clues to the incident); *Commonwealth* v. *Rexach*, 20 Mass. App. Ct. 919, 920 (1985) (entry into defendant's bedroom reasonable to protect wife where officer followed defendant into the bedroom after witnessing him threatening wife, who was screaming and had two black eyes); *Commonwealth* v. *Donoghue*, 23 Mass. App. Ct. 103, 104-106 (1986) (police entry lawful while investigating brutal slashing of a victim who had indicated defendant as his assailant whom police reasonably believed to be inside his apartment and armed and dangerous); *Commonwealth* v. *Hurd*, 29 Mass. App. Ct. at 930 (police stop at entrance to route 128 of automobile matching description of one said, by an anonymous caller, to be driven by a drunken adult with three small children as passengers justified by need to protect life and prevent serious injury).

proffered by the Commonwealth as validating the warrantless entry is that recognized — particularly in illegal drug cases — when entry was reasonably believed to be necessary to prevent the imminent destruction or removal of incriminating evidence. See *Commonwealth* v. *Hall*, 366 Mass. 790, 800-804 (1975); *Commonwealth* v. *Amaral*, 16 Mass. App. Ct. 230, 233-234 (1983).[14]

The judge observed that "[t]here was some urgency in locating [DiGeronimo] . . . to determine if he was under the influence and was avoiding detection. In such matters, time delays are critical . . . ." The Commonwealth's brief glosses this generalized concern by positing that "Officer Deshod knew that the alcohol in the defendant's system was dissipating and that any delay would decrease the evidentiary value of any observations of the defendant's physical condition."

The "destruction of the evidence" exception to the warrant requirement does not, however, apply here for several reasons. First, the record does not support it. Deshod's and his supervisor's only expressed rationale for entering the apartment was "to check on [DiGeronimo's] welfare." Nothing in his or any other testimony or exhibit raises the possible loss of evidence of intoxication as an objective motivation for the entry. To the contrary, the almost hour-long delay (between the time Deshod discerned at the scene that DiGeronimo might have caused the accident while driving under the influence of alcohol and the time Deshod arrived at DiGeronimo's apartment) belies the formation of any such police determination in this regard. Either Deshod or the police cruiser that had preceded him to the scene could have immediately proceeded to DiGeronimo's nearby apartment had there actually existed police apprehension over the "dissipation" of evidence of the apparent offense.

Such an unexplained delay, "in the absence of additional facts explaining why it was 'impracticable for the police to

---

[14]Interestingly, the Supreme Court of the United States does not appear to have expressly held that police may enter and search a dwelling without a warrant for such a purpose. Cf. *Ker* v. *California*, 374 U.S. 23, 27-29, 35-37, 40-41 (1963).

obtain a warrant' . . . precludes a finding . . . justifying the warrantless entry into the apartment. . . . No such additional facts were adduced. . . ." *Commonwealth* v. *Bates*, 28 Mass. App. Ct. at 221. See also *Commonwealth* v. *Forde*, 367 Mass. at 807. No "exigency" sufficient to exonerate the extraordinary act of warrantless police intrusion into a private dwelling exists when the eventual juncture was a reasonably foreseeable result of earlier police inaction. See *id.* at 803; *Commonwealth* v. *Sergienko*, 399 Mass. 291, 297 (1987); *Commonwealth* v. *Wigfall*, 32 Mass. App. Ct. 582, 587-588 (1992).

The court's and the Commonwealth's assumptions about Deshod's unarticulated desire to obtain imminently evanescing evidence may appear plausible.[15] However, the finding of such an exigency cannot rest on an after-the-fact discovery of a justification that never occurred to, nor was mentioned by, the police but is subsequently imputed to them in an effort to salvage a well-intentioned but flawed prosecution — any more than a rejection of exigent circumstances should be

---

[15]While the judge's concern about the dissipation of blood alcohol evidence within a short period might be correct as a general proposition, the variables governing rate of dissipation (time, quantity, body weight, age, etc.) do not appear to be matters that are judicially noticeable (at least we know no case so holding). The issue is presumably one that must be determined on the basis of qualified expert testimony rather than lay opinion. Cf. *Commonwealth* v. *Connolly*, 394 Mass. 169, 175 (1985); *Commonwealth* v. *Marley*, 396 Mass. 433, 439 (1985); *Commonwealth* v. *Smythe*, 23 Mass. App. Ct. 348, 352-354 (1987). We are aware that the Supreme Judicial Court has recently described blood and breath test evidence, on the issue of intoxication in operating under the influence cases, as "extremely fleeting," so that "time is of the essence in obtaining the requisite testing." *Commonwealth* v. *Hampe*, 419 Mass. 514, 520 (1995). This observation was merely a variation of the accepted fact, stated in *Commonwealth* v. *Andrade*, 389 Mass. 874, 881 (1983), that such evidence "is available for only a short period of time." *Hampe* expressed that truism with somewhat more urgency as a function of the specific context in that case, the defendant's booking after his arrest, which frequently occurs well after the last intake of alcohol, the incident giving rise to the arrest, or even the arrest itself. *Hampe's* recognition of the physical fact of dissipation over some short period of time is, however, too imprecise to satisfy the high degree of specificity and imminence required before the threatened loss of evidence can justify warrantless entry. See *Commonwealth* v. *Hall*, 366 Mass. at 802.

based upon "leisured retrospective analysis." *Commonwealth
v. Young,* 382 Mass. at 456. The required exigency can only
be founded upon a reasonable conclusion reached by the po-
lice at the time of the entry, on the basis of the information
then available to them, that there was a specific threat of
imminent loss or destruction of important evidence. See
*Commonwealth* v. *Hall,* 366 Mass. at 802; *Commonwealth
v. Huffman,* 385 Mass. 122, 126 (1982); *Commonwealth* v.
*Amaral,* 16 Mass. App. Ct. at 233; *Commonwealth* v. *Gar-
cia,* 34 Mass. App. Ct. at 394. The instant record contains
nothing demonstrating that Deshod or his supervisor had
made that crucial determination. "We cannot speculate or go
outside of the record to justify the warrantless entry into a
private residence." *Commonwealth* v. *Huffman,* 385 Mass. at
127. See also *Commonwealth* v. *Garcia,* 34 Mass. App. Ct.
at 394-395.

Neither the Commonwealth's brief nor the judge's new
trial ruling cited a single Massachusetts or Federal authority
justifying warrantless intrusion into a suspected drunk
driver's home because of the possible loss or destruction of
evidence of his inebriation. We view the limited pertinent au-
thority as pointing to an opposite conclusion. As the United
States Supreme Court has stated:

> " . . . a warrantless home arrest cannot be upheld sim-
> ply because evidence of [the appellant's inebriation]
> might have dissipated while the police obtained a war-
> rant. To allow a warrantless home entry on these facts
> would be to approve unreasonable police behavior that
> the principles of the Fourth Amendment will not
> sanction."[16]

---

[16]In *Welsh* v. *Wisconsin, supra,* the Supreme Court stated that an im-
portant factor in determining whether an exigency exists is the gravity of
the underlying offense for which the arrest is being made. 466 U.S. at 753.
One reason it held that the warrantless, nighttime entry into the defend-
ant's home to arrest him for operating under the influence (O.U.I.) vio-
lated the Fourth Amendment was that, in Wisconsin, O.U.I was a civil,
nonjailable traffic offense. *Id.* at 754. Here, the judge stressed in his analy-
sis of the exigent circumstances that O.U.I., while not a felony, is nonethe-
less a "serious charge." However, the *Welsh* opinion observed that judicial

*Welsh* v. *Wisconsin,* 466 U.S. at 754. Accord *Patzner* v. *Burkett,* 770 F.2d 1363 (8th Cir. 1985). Such a result is especially appropriate in this Commonwealth, where the police cannot constitutionally compel a suspect to take a field sobriety, breathalyzer, or blood test, nor can the prosecution introduce evidence of a defendant's refusal to take such tests. *Commonwealth* v. *McGrail,* 419 Mass. 774, 777-780 (1995). Contrast *Oren* v. *Henrie,* 868 P.2d 1384, 1388-1392 (Utah 1994). For this particular offense, Massachusetts police can have no reasonable expectation that a warrantless entry will enable them to obtain or preserve such evidence, even if, unlike the present situation, they consciously intend their entry for that purpose.[17]

*The ineffectiveness of counsel.* Evidence obtained as the proximate result of unjustified, warrantless police entry into private quarters, in substantial (and not merely technical) violation of the Fourth Amendment, is subject to the exclusionary rule. The direct evidentiary fruits of such an entry are subject to suppression as inadmissible evidence, see *Mapp* v. *Ohio,* 367 U.S. 643, 654-655 (1961) (but see *United States* v. *Leon,* 468 U.S. 897, 922 [1984]), at least in Massachusetts under art. 14. See *Selectmen of Framingham* v. *Municipal Ct. of the City of Boston,* 373 Mass. at 786-788; *Commonwealth* v. *Ford,* 394 Mass. 421, 425-427

---

precedent had limited warrantless home arrests to major felonies, and then only when other identifiable exigencies, independent of the gravity of the offense, existed at the time of the arrest. *Id.* at 752. "[N]o exigency is created simply because there is probable cause to believe that a serious crime has been committed." *Id.* at 753.

[17]The other factors that the courts have deemed most important in evaluating claims that exigency supported an intrusion without warrant were also absent from the present circumstances: the crime was not one of violence, there was no reason to believe the suspect was armed, there was no reason to believe that the suspect would attack them or someone else, there was no reason to believe he might escape if not apprehended, and the entry was not made in the daytime. See *Commonwealth* v. *Pietrass,* 392 Mass. at 898-900. An additional, minor factor sometimes considered in the calculus of police reasonableness, whether the entry was peaceable, *id.* at 898-899, existed here but does not appear to have independent significance or ever to have played a vital part in any adjudicated exigency determination.

(1985); *Commonwealth* v. *Conway*, 2 Mass. App. Ct. 547, 553-554 (1974). Cf. *Commonwealth* v. *Rutkowski*, 406 Mass. 673, 676-677 (1990). Here, that evidence comprised officer Deshod's observations of DiGeronimo and the breathalyzer test results indicating prima facie intoxication. None of that evidence would have been obtained but for the unlawful entry.

Had that evidence been suppressed, the Commonwealth's case against DiGeronimo would have rested on the lay opinion of the other driver, Eagan, that DiGeronimo appeared drunk, and on the tape of DiGeronimo's telephone call to the police. Although that evidence would have been sufficient to submit the case to the jury, it hardly constituted an overwhelming or even compelling demonstration of the defendant's culpability. We are unable to say that the tainted fruits of the illegal entry — a police officer's authoritative testimony and opinion regarding DiGeronimo's inebriated condition and, in particular, breathalyzer test results enjoying an aura of scientific reliability, if not conclusiveness — were without effect on the jury and did not contribute to the guilty verdict. Cf. *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980).

A motion to suppress that significant, possibly outcome-determinative, illegally obtained evidence would clearly have represented "better work [that] might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). The unopposed allowance in evidence of those fruits of the improper entry, therefore, constituted ineffective assistance of counsel. It directly resulted in a constitutional error that cannot be deemed (nor has the Commonwealth attempted to meet its burden of proving that it was) harmless beyond a reasonable doubt. See *Commonwealth* v. *Marini*, 375 Mass. 510, 520-521 (1978); *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 n.8 (1987). Contrast *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 558 (1990); *Commonwealth* v. *Garcia*, 34 Mass. App. Ct. at 390-

391. DiGeronimo's new trial motion should have been allowed, and a new trial will be in order.[18]

> *Order denying motion for new*
> *trial reversed.*
> *Judgment reversed.*
> *Verdict set aside.*

---

[18]While we "regret . . . the waste of time and resources invested in the trial, as well as . . . the delay in reaching a final disposition of the charges," *Commonwealth* v. *Marini,* 375 Mass. at 522, that will necessarily result from our decision, it is the price our society has agreed to pay in order to put privacy and the integrity of the home beyond the reach of unwarranted police intrusions. The community that fails to insist on scrupulous observance of high standards by its police and prosecutors has lost track of its fundamental purposes, and courts that approve well-meaning but unconstitutional conduct by law enforcement officers, even in the case of undoubtedly guilty defendants, deal the administration of justice and the integrity of the legal process a greater blow than when they permit a particular criminal to delay, or sometimes even wholly to escape, due punishment by insisting on an untainted, constitutionally correct trial. See *Mapp* v. *Ohio,* 367 U.S. at 658-659; *Olmstead* v. *United States,* 277 U.S. 438, 470, 485 (1928) (Holmes and Brandeis, JJ., dissenting); *Commonwealth* v. *Kimball,* 37 Mass. App. Ct. 604, 608-609 (1994).