# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 11, 2015

**NO. 32,820**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JUAN CORDOVA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Mary Marlowe-Sommer, District Judge**

Hector H. Balderas, Attorney General
Jacqueline R. Medina, Assistant Attorney General
Santa Fe, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
B. Douglas Wood, III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**FRY, Judge.**

{1}     Defendant appeals his convictions for causing great bodily injury by vehicle, aggravated driving while under the influence (DWI), knowingly leaving the scene of an accident, and homicide by vehicle. Defendant raises a number of arguments. However, the pertinent issue for this appeal is whether the district court erred in determining that the emergency assistance doctrine justified the warrantless entry by two Rio Arriba County sheriff's deputies into Defendant's residence. Because we conclude that the deputies did not have reasonable grounds to believe that a genuine emergency existed requiring their immediate aid, we hold that the district court erred in denying Defendant's motion to suppress.

**BACKGROUND**

{2}     The facts underlying Defendant's convictions are as follows. A group of motorcyclists returning from a motorcycle rally in Red River, New Mexico, were traveling on State Road 76 near Chimayo, New Mexico. Defendant, driving a truck in the opposite direction, crossed the center lane and struck the motorcyclists. Several of the motorcyclists were injured in the collision, and one, the lead motorcyclist, was killed. Following the collision, Defendant drove a short distance before he and two passengers abandoned the vehicle.

{3} Deputy Paula Archuleta was one of the first deputies to respond to the scene. A witness informed Deputy Archuleta that the abandoned truck was farther up the road and that three individuals were seen running from the scene in the vicinity of the Rio Chiquito. While a fellow deputy stayed with the victims, Deputy Archuleta began investigating the abandoned truck. She noted damage on the front passenger side and a cracked windshield on the driver side. After running the license plate, Deputy Archuleta was informed that the truck belonged to Defendant. Deputy Archuleta called Deputy Isaac Martinez, who was off-duty but lived nearby, and asked for his assistance in searching for the suspects. The deputies first began searching the area surrounding the Rio Chiquito. After being told by a volunteer firefighter where Defendant lived, the deputies proceeded to Defendant's residence.

{4} The deputies' testimony at the preliminary hearing varied slightly on the events that followed once they reached Defendant's residence. Deputy Archuleta testified that the door to the house was ajar and that she heard some type of "background noise" in the home. She testified that she knocked and announced the deputies' presence and, upon getting no response, entered the home. Deputy Martinez, however, testified that they did not knock or hear "background noises." He testified that the deputies announced their presence and walked into the home. Both deputies testified that they entered the home with guns drawn.

{5} The deputies located Defendant in his bedroom lying on the bed. The deputies asked if he was Juan Cordova. When Defendant responded that he was, the deputies ordered him to put his hands up. They then told Defendant he was the suspected driver, escorted Defendant out of the house, and told him that he was being detained for questioning. The deputies testified that Defendant had a cut on his forehead, although a physician who treated Defendant later testified that he did not recall such an injury. When deputies asked if he was okay, Defendant responded that his truck had been stolen and that he was not involved in the accident. Once the deputies removed Defendant from the home, he was placed in handcuffs and searched. A set of car keys was found in his front pocket. Defendant was taken to the sheriff's department and charged in relation to the death and injuries of the motorcyclists. A chemical test would later show Defendant's blood alcohol content to be 0.14.

{6} Before trial, Defendant filed a motion to suppress, arguing that the deputies' entry into his home was in violation of the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution. The district court denied the motion to suppress and concluded that, under the emergency assistance doctrine, the deputies' warrantless entry into the home was justified by the deputies' concern for Defendant's safety. *See State v. Ryon*, 2005-NMSC-005, ¶¶ 27, 39, 137 N.M. 174, 108 P.3d 1032 (holding that "police officers may enter a home

without a warrant or consent under the emergency assistance doctrine" when police have "reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property"). The case proceeded to trial, and Defendant was convicted on two counts of causing great bodily injury by vehicle, two counts of aggravated DWI, one count of leaving the scene of an accident, and one count of homicide by vehicle. Defendant now appeals.

**DISCUSSION**

**Standard of Review**

{7}    We review a district court's decision regarding a motion to suppress evidence as a mixed question of fact and law. *State v. Vandenburg*, 2003-NMSC-030, ¶ 17, 134 N.M. 566, 81 P.3d 19. "We view the facts in the light most favorable to the prevailing party and defer to the district court's findings of historical facts and witness credibility when supported by substantial evidence." *Ryon*, 2005-NMSC-005, ¶11. "The legality of a search, however, ultimately turns on the question of reasonableness." *Id.* Reasonableness is determined de novo. *Id.*

**Emergency Assistance Doctrine**

{8}    Defendant challenges the district court's ruling that the deputies' entry into Defendant's home was justified under the emergency assistance doctrine. While "[w]arrantless searches and seizures inside a home are presumptively unreasonable,"

4

the emergency assistance doctrine is one of the "few specific, narrowly defined exceptions." *Id.* ¶ 23. In *Ryon*, our Supreme Court adopted the three-part test utilized in *People v. Mitchell*, 347 N.E.2d 607, 609 (N.Y. 1976). *Ryon*, 2005-NMSC-005, ¶ 29. It is the state's burden to establish all three elements. *Id.* First, "the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property." *Id.* (alteration, internal quotation marks, and citation omitted). Second, "the search must not be primarily motivated by intent to arrest and seize evidence."[1] *Id.* (alteration, internal quotation marks, and citation omitted). Finally, "there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *Id.* (alteration, internal quotation marks, and citation omitted).

{9} Defendant's argument largely focuses on the first element. Defendant argues that the deputies did not have sufficient information to reasonably believe that he was in need of immediate aid. Defendant also argues, under the second element of the *Mitchell* test, that without such reasonable belief, the deputies' actions were primarily

___

[1]Subsequent to our Supreme Court's decision in *Ryon*, the United States Supreme Court eliminated the second element of the *Mitchell* test because an officer's "subjective motivation is irrelevant." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006). Although we state the *Mitchell* test as our Supreme Court adopted it in *Ryon*, the subjective element of the test is ultimately immaterial to our analysis in this case.

motivated by their intention to apprehend him and gather evidence. In practice, however, this distinction is irrelevant because without such reasonable grounds, the deputies' actions were unlawful.

{10}      As recognized in *Ryon*, because of the strong privacy interest in the home, the first element requires a genuine emergency. 2005-NMSC-005, ¶ 26. This means "a strong perception that action is required to protect against imminent danger to life or limb" and circumstances so "sufficiently compelling [as] to make a warrantless entry into the home objectively reasonable[.]" *Id.* ¶ 31. Reasonableness is "tested objectively under the totality of the circumstances." *Id.* ¶ 30. Useful factors for this determination are the "purpose and nature of the dispatch, the exigency of the situation based on the known facts, and the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished." *Id.* ¶ 32 (internal quotation marks and citation omitted). Furthermore, generalized testimony regarding a possible or potential emergency is insufficient to carry the state's burden on this element. Instead, "officers must have credible and specific information that a victim is very likely to be located at a particular place and in need of immediate aid to avoid great bodily harm or death." *Id.* ¶ 42.

{11}      We agree with Defendant that the State failed to establish that there were reasonable grounds for the deputies to believe that an emergency necessitated their

6

immediate entry into Defendant's home. The only specific information available to the deputies at the time was that Defendant's truck had been involved in an accident, albeit a serious one, and that three individuals were seen abandoning the truck. At this point, the deputies had no concrete information that Defendant was the driver involved in the accident, or even at home. *Id.* ¶ 43 (noting that the officers were unaware if the defendant was even in the home).

{12}     Even assuming the deputies knew that Defendant was the driver, they had no specific information that he was seriously injured and in need of immediate aid. *See id.* (stating that the officers' information was insufficient where they "did not know the nature or extent of the injury" or even "whether he was injured). There were no obvious indications in the cab of the truck, such as blood or impacts to the windshield coming from inside, that any of the vehicle's occupants were injured. *See City of Fargo v. Ternes*, 522 N.W.2d 176, 177-78 (N.D. 1994) (holding that one circumstance justifying the officers' reasonable belief that a driver in an accident suffered sufficiently serious injuries was the presence of "blood on the seat and blood mingled with glass on the dashboard and steering wheel"). More importantly, none of the witnesses who saw the individuals fleeing the truck told deputies that they appeared injured. *See State v. Geisler*, 576 A.2d 1283, 1289 (Conn. App. Ct. 1990), *vacated on other grounds*, 498 U.S. 1019 (1991) (stating that the lack of indication

by witnesses that the driver was injured or in need of assistance cast doubt on the notion that the "driver was injured to the point of needing immediate aid"). Indeed, the fact that the suspects had fled the truck, and, in Defendant's case, conceivably had run home, is inconsistent with the degree of injury necessitating immediate police assistance by way of a warrantless entry. *See State v. Seavey*, 789 A.2d 621, 624 (N.H. 2001) (stating that a witness's observation of the defendant walking away from the accident and down the street "indicated that she was not physically impaired"); *Commonwealth v. DiGeronimo*, 652 N.E.2d 148, 155 (Mass. App. Ct. 1995) ("[The defendant's] driving off from the accident scene suggested lack of incapacitating injury.").

{13} Finally, no circumstances at Defendant's home indicated a genuine emergency. No signs of injury, such as blood, were noted on the property. *See People v. Copenhaver*, 21 P.3d 413, 416 (Colo. App. 2000) (affirming the officer's warrantless entry where the officer noted blood inside the vehicle involved in the crash and a trail of blood leading from the outside of the defendant's apartment through the residence). No sounds from inside the house alerted the deputies that Defendant was in need of immediate aid. *DiGeronimo*, 652 N.E.2d at 155 (noting that sounds of moaning or distress may be indicative of an emergency inside the residence). And, while in some cases an occupant's failure to respond to repeated knocking can

indicate an emergency, especially in instances where the officers already have specific information that the victim is in the home and seriously injured, the deputies did not have that chance here because they entered the home immediately after announcing their presence. *See Ternes*, 522 N.W.2d at 177-78 (holding that the warrantless entry was permissible where the officers knew the defendant was inside, had been involved in a serious accident, was bleeding, and where they received no response after knocking on the front door for several minutes, entered the residence). Given these circumstances, we conclude that the deputies did not have reasonable grounds to believe that Defendant might have been injured to an extent requiring their immediate entry and assistance.

{14}    Although the State failed to establish that the objective circumstances necessitated a warrantless entry, we are similarly unconvinced that the deputies' testimony was sufficient to establish that a genuine emergency necessitated their entry. Both deputies testified that the reason they entered the home was because they were "concerned" for Defendant's safety. Deputy Martinez acknowledged that they did not know what Defendant's injuries were, if any. Consistent with the deputies' lack of specific information, Deputy Martinez characterized the entry as a "welfare check." However, this testimony does not establish the requisite circumstances needed to demonstrate a legitimate emergency requiring immediate police assistance.

9

*State v. Baca*, 2007-NMCA-016, ¶ 31, 141 N.M. 65, 150 P.3d 1015 ("*Ryon* makes it clear that the burden to demonstrate an emergency is high."); *State v. Martin*, 193 P.3d 993, 998-99 (Or. Ct. App. 2008) (stating that while the officers' testimony regarding concern about the defendant's well-being and if she was "okay" after she was involved in hit and run "might reveal well-founded speculation that perhaps all was not well with defendant, it falls far short of revealing a belief that immediate intervention was necessary to protect her life."). Instead, this testimony is the type of speculation and conjecture that we have previously rejected as supporting an officer's warrantless entry under the emergency assistance doctrine. *See Baca*, 2007-NMCA-016, ¶ 27 ("Speculation and conjecture are insufficient to establish an emergency at hand and an immediate need for police assistance." (alteration, internal quotation marks, and citation omitted)); *Ryon*, 2005-NMSC-005, ¶ 43 (stating that the officers had insufficient information to justify entry into the residence where they "had only generalized, nonspecific information that [the d]efendant might be inside [the home] and that he might have sustained a head or face injury."). We therefore conclude that the district court erroneously denied Defendant's motion to suppress the evidence seized as a result of the deputies' unreasonable entry into Defendant's home.

**Sufficiency of the Evidence**

{15}    Defendant challenges the sufficiency of the evidence supporting his conviction

for causing great bodily injury by vehicle to Vivian Woodall contrary to NMSA 1978, Section 66-8-101 (2004). Because we are reversing the district court's judgment, we consider whether sufficient evidence supported this conviction in order to determine whether double jeopardy principles would prohibit retrial of Defendant on this charge. *State v. Valino*, 2012-NMCA-105, ¶ 18, 287 P.3d 372. Because Defendant does not challenge the sufficiency of the evidence regarding his other convictions, we do not undertake a similar double jeopardy analysis in connection with those charges.

{16} "When reviewing a challenge to the sufficiency of the evidence, we must determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *See State v. Templeton*, 2007-NMCA-108, ¶ 28, 142 N.M. 369, 165 P.3d 1145 (internal quotation marks and citation omitted). "A reviewing court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314.

{17} In order to convict Defendant of causing great bodily injury by vehicle, the State was required to prove beyond a reasonable doubt that (1) "[t]he defendant operated a motor vehicle while under the influence of intoxicating liquor, or while

under the influence of valium, . . . or in a reckless manner"; (2) "[t]he defendant thereby caused the great bodily injury to Vivian Woodall", and (3) "[t]his happened in Rio Arriba County, New Mexico on or about the 28th day of May 2011." Defendant specifically argues that there was insufficient evidence that Woodall's injuries constituted great bodily injury. Consistent with UJI 14-131, great bodily injury was defined in the jury instructions as "an injury to a person which creates a high probability of death or results in serious disfigurement or results in permanent or prolonged impairment of the use of any member or organ of the body."

{18} Woodall testified at trial that she experienced severe bruising, road rash, and bruised ribs as a result of the collision. The bruising and road rash covered her right side. She testified that she was unable to work for approximately a month. In addition, for approximately the first two weeks, she was largely unable to move because of the extreme pain from her bruised ribs. She testified that at certain times she still experiences pain resulting from her bruised ribs.

{19} Viewing the evidence in the light most favorable to the verdict, the jury could determine that Woodall suffered great bodily injury. "Prolonged impairment" is not a technical term. *Cf. State v. Jim*, 1988-NMCA-092, ¶ 20, 107 N.M. 779, 765 P.2d 195 (construing similar term, "protracted impairment"). "Prolonged impairment," like "protracted impairment," means a "lengthy or unusually long time under the

12

circumstances." *Id.* ¶ 21 (internal quotation marks and citation omitted). Thus, it was for the jury to determine whether the impairment was for a sufficiently extended period of time so as to meet this definition. *Id.* In this case, the jury determined that Woodall's extreme and immobilizing pain over the course of the month, in addition to recurrent bouts of pain, were sufficient to constitute great bodily injury, and we will not interfere with its determination. Accordingly, sufficient evidence supported Defendant's conviction on this charge, and retrial on this charge is not barred.

**CONCLUSION**

{20}    For the foregoing reasons, we reverse the district court's denial of Defendant's motion to suppress and remand for proceedings consistent with this opinion.

{21}    **IT IS SO ORDERED.**


_____
**CYNTHIA A. FRY, Judge**


**WE CONCUR:**


_____
**JAMES J. WECHSLER, Judge**


_____
**RODERICK KENNEDY, Judge**

13