2007-NMCA-016

150 P.3d 1015

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**John D. BACA, Defendant–Appellant.**

**No. 25,952.**

Court of Appeals of New Mexico.

Nov. 22, 2006.

Certiorari Denied, No. 30,159, Jan. 25, 2007.

Patricia A. Madrid, Attorney General, James W. Grayson, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Catherine A. Begaye, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

**OPINION**

SUTIN, Judge.

{1} Under the emergency assistance doctrine, a law enforcement officer may enter a home without a warrant. *See State v. Ryon*, 2005–NMSC–005, ¶ 27, 137 N.M. 174, 108 P.3d 1032. In this case a police officer entered Defendant's home after Defendant's employer and Defendant's aunt expressed concerns about Defendant's well being. Defendant had been absent from work with no contact for two days and information received by the officer suggested possible overdose. The officer, along with Defendant's aunt and other family members, entered Defendant's home. After a search, drugs were found. The district court denied Defendant's motion to suppress, ruling that it was reasonable for the officer to enter the home to check on Defendant. We reverse the denial of Defendant's motion to suppress. We hold that the State did not demonstrate the high level of urgency required under *Ryon*. We

also hold that a feasible and effective alternative to police entry was available because a family member was present and available to first enter the house and check on Defendant.

## BACKGROUND

{2} We review the testimony in detail because the application of the emergency assistance doctrine is highly fact-dependent. *See id.* ¶ 30.

### Crouch Testimony

{3} Roy Crouch testified that Defendant John Baca was employed with Crouch Plumbing, Heating, and Air Conditioning. Defendant was a "pretty good hand" and was overseeing quite a bit of work. As part of his work duties Defendant was supposed to check in. On the afternoon of June 22, 2004, he did not check in. The following day, Mr. Crouch did not hear from Defendant and was concerned something might be wrong. Mr. Crouch was unable to get in contact with Defendant. The next morning, June 24, Mr. Crouch went to Defendant's house to see what was going on. He knocked on the doors without success. He yelled Defendant's name, banged loudly, and tapped on windows. The Crouch company truck was sitting in the driveway with the keys in it, the windows down, and all of the tools vulnerable. Mr. Crouch returned to his office, called the police, and spoke with Officer Jerry Chaves. Mr. Crouch said he was "quite concerned that something was wrong with John" and was also concerned that the truck was just sitting in the driveway, unlocked, and vulnerable to theft. Mr. Crouch said it was unusual not to be able to get in touch with Defendant.

{4} Officer Chaves met Mr. Crouch at Defendant's house. Officer Chaves banged on the doors without success. The officer allowed Mr. Crouch to take the truck and then the officer left. While Mr. Crouch was preparing to take the truck, but after Officer Chaves had left, a man came from the back side of the house wanting to know what Mr. Crouch was doing. Mr. Crouch knew the man, Dominic Vasquez. Mr. Crouch asked, "where's John?" Mr. Vasquez said, "Well,

he's been sick and he's been passed out for a day and a half." Mr. Vasquez also said Defendant was having back problems and had been passed out since Tuesday. Mr. Crouch asked to talk to Defendant and Mr. Vasquez said, "no." Mr. Crouch said, "Well, somebody needs to check on him if he's been out for a day and a half." Mr. Vasquez's response was "we will take care of that."

{5} Mr. Crouch once again called Officer Chaves, told him "there might be a problem," and told him about his conversation with Mr. Vasquez. Mr. Crouch testified that he was "very concerned" by the fact that Defendant had been out for that length of time. Officer Chaves testified that Mr. Crouch also expressed his concern that Defendant had been hanging out with questionable people, such as drug users. Mr. Crouch, however, testified that he did not tell the officer that information until a day or so later. This factual dispute does not affect our analysis in this case because we view the facts in the light most favorable to the State as the prevailing party. *See id.* ¶ 11.

### Officer Chaves' Testimony

{6} Officer Chaves testified that Mr. Crouch called him on June 24, 2004, concerned about an employee that had not been at work for a couple of days. Mr. Crouch told him Defendant was a "model" employee who had not shown up or called in sick. Officer Chaves went to Defendant's residence, characterizing his visit as a "welfare check." He allowed Mr. Crouch to take the Crouch company truck.

{7} Sometime after Officer Chaves left, Mr. Crouch called him again and told him of the conversation with Mr. Vasquez. Officer Chaves' understanding of the situation was that Mr. Vasquez had come up to Mr. Crouch and asked Mr. Crouch why the police had been there. He understood that Mr. Vasquez told Mr. Crouch that Defendant was inside, had been asleep for a day and a half, and was breathing. The officer was told by Mr. Crouch that Defendant was "possibly unconscious." Officer Chaves said he received another call almost immediately after Mr. Crouch's second call, from Lucy Urias, Defendant's aunt, who said she was the own-

er of the house. She had a key to the house and said Officer Chaves could check on Defendant.

{8} About forty minutes after his first visit, Officer Chaves again arrived at the home to meet Ms. Urias. On arrival, he beat on doors and knocked on windows, made a lot of noise, and announced, "police officer." Officer Chaves also characterized this action as a welfare check. The screen door was latched, and Ms. Urias tried to open it but could not, so Officer Chaves opened it. Ms. Urias then tried to open the front door using her key. The door would not open because there was something holding it closed near the top, so Officer Chaves, with Ms. Urias' permission, forced it open. Immediately inside the door Chaves encountered a woman and Israel "Strawberry" Lopez, a gang member he knew very well. The woman tried to leave but Officer Chaves would not allow it. The officer saw methamphetamine paraphernalia and the television was showing his police car in front of the residence. At that point, Officer Chaves called the drug task force for help. Meanwhile, the aunt and other family members went to the back of the house to check on Defendant. Usually, the officer would not allow family members to go past him like that, but everything happened quickly.

{9} Officer Chaves said he was not doing a drug investigation when he went into the house because that kind of work is extremely dangerous and one would not do that alone, without any back-up. He said he was planning to stand by while the aunt, Ms. Urias, went in.

{10} On cross-examination, Officer Chaves said he suspected that Defendant was suffering from sleep deprivation from methamphetamine abuse, or possible overdose. He did not remember being told, or knowing anything about, pain medication for a back problem. He admitted he knew that somebody was in the house.

{11} On redirect, the court interjected its own questions, asking Officer Chaves if he was concerned about "illness or something wrong." The officer answered, "Other than something maybe with his drug use I can't tell you if he was injured or hurt or anything,

no sir." The officer was aware Defendant had been asleep for a long time and said he thought it was a "possible overdose." He said there was a possibility of a person in need of immediate aid. He said he was not involved in crime solving and had no suspicion of criminal activity at the time he entered the house.

### Lucy Urias' Testimony

{12} Ms. Urias testified that she owned the house along with two other family members. Defendant rented the house. Someone at her church told her the police had been at the house twice the morning of June 24. She called the police dispatcher to find out why the police had been at her property. Officer Chaves returned her call and told her he had been at the house on a welfare check. She told the officer that she had a key and they agreed to meet at the house. When she arrived, Jeremy Valenzuela, another family member, was already there, knocking on the back door. He told her he was there because Defendant's mother had said she could not get in touch with Defendant. Officer Chaves arrived. She did not tell the officer about her conversation with Mr. Valenzuela. They knocked but still no one answered. The screen door was locked and Ms. Urias told Officer Chaves to pull the screen door open. Even after the key was used, the front door would not open because it was stuck at the top and Ms. Urias gave Officer Chaves permission to push it open. The court asked Ms. Urias if she told Officer Chaves that she was concerned about Defendant's health or welfare, but she could not specifically recall whether she did or not. Her intention of the visit was to see what was wrong. Once inside, she found Defendant passed out.

{13} After this evidence was presented defense counsel argued that there was no immediate need and no emergency sufficient to justify entry under the emergency assistance doctrine. He argued that the investigation was a criminal investigation, which also made the doctrine inapplicable.

{14} The court ruled against Defendant, reasoning that there was concern about De-

fendant's welfare. Defendant had been asleep or passed out for a day and a half to two days and the court commented that people do not do that without something being wrong. The court further commented that people die from drug overdoses and if they are found soon enough then medical personnel might be able to save them. The court ruled that it was reasonable for the officer to go in under the circumstances.

## DISCUSSION

### A. Standard of review

{15} The suppression issue in this case presents a mixed question of fact and law. *See Ryon*, 2005–NMSC–005, ¶ 11, 137 N.M. 174, 108 P.3d 1032. We view the facts in the light most favorable to the prevailing party, but the legality of the entry and search presents a question of reasonableness. *Id.* The district court's ultimate determination of the legality of the entry presents a legal issue that we review de novo. *See id.*

### B. Emergency Assistance Doctrine

{16} The essential issue in all search and seizure cases is whether the search and seizure was reasonable. *See State v. Attaway*, 117 N.M. 141, 149, 870 P.2d 103, 111 (1994). "Warrantless searches and seizures inside a home are presumptively unreasonable, subject only to a few specific, narrowly defined exceptions." *Ryon*, 2005–NMSC–005, ¶ 23, 137 N.M. 174, 108 P.3d 1032. The emergency assistance doctrine is one of those exceptions. *See id.* ¶ 27. The doctrine presents a tension between the sanctity of the home under the Fourth Amendment and the legitimate need to intervene in good faith to deal with a genuine emergency. *See id.* ¶¶ 24, 25, 28. As an exception to the warrant requirement, the State bears the burden of proving the doctrine is applicable. *See State v. Zamora*, 2005–NMCA–039, ¶ 15, 137 N.M. 301, 110 P.3d 517 (stating that the State has a heavy burden to justify a warrantless search).

{17} *Ryon* requires the State to prove three elements to justify an emergency assistance entry. 2005–NMSC–005, ¶ 25, 137 N.M. 174, 108 P.3d 1032. First, the State must demonstrate under an objective standard that the officer "reasonably believed that a person within was in need of immediate aid to protect or preserve life or avoid serious injury." *Id.* ¶ 29. Under the emergency assistance doctrine, the "motivation for the entry without a warrant or probable cause must be a strong sense of an emergency." *Id.* ¶ 27. Second, the State must demonstrate that the officer's motivation for the initial decision to enter the home is to render protection of human life or property in imminent danger and not to perform a criminal investigation. *Id.* ¶ 36. Finally, the State must show that the police did not expand the scope of the intrusion beyond what is necessary to address the emergency. *See id.* ¶ 38.

{18} Expressing the concern in terms of a degree of urgency, *Ryon* emphasized that there must be "an emergency, a strong perception that action is required to protect against imminent danger to life or limb, an emergency that is sufficiently compelling to make a warrantless entry into the home objectively reasonable under the Fourth Amendment." *Id.* ¶ 31. "[O]nly a genuine emergency will justify entering and searching a home without a warrant and without consent or knowledge." *Id.* ¶ 26. In determining whether an emergency justifying a warrantless entry has been established, relevant factors are "the purpose and nature of the dispatch, the exigency of the situation based on the known facts, and the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished." *Id.* ¶ 32 (internal quotation marks and citation omitted).

{19} In applying an objective standard to measure the reasonableness of the officer's belief that an emergency is present, the officer must have "credible and specific information that a victim is very likely to be located at a particular place and in need of immediate aid to avoid great bodily harm or death." *See id.* ¶ 42. There must be reasonable grounds to believe that an emergency exists, and "[t]he officer must be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant th[e] intrusion." *See* 3 Wayne R. LaFave, *Search And Seizure: A Treatise On The Fourth Amend-*

*ment* § 6.6(a), at 452 (4th ed.2004) (internal quotation marks omitted). An unsupported and unexplained claim is insufficient. *See id.*

{20} The emphasis throughout *Ryon* on "a strong sense of an emergency," a "genuine emergency," a "strong perception that action is required to protect against imminent danger to life or limb," a "sufficiently compelling" emergency, and "compelling and immediate need for police to take swift action to prevent imminent danger to life or serious injury," is consistent with the fundamental principle that a warrantless entry into a home is an exception and allowed only when justified by exigent circumstances. *Ryon,* 2005–NMSC–005, ¶¶ 23, 26 n. 4, 27, 29, 31, 137 N.M. 174, 108 P.3d 1032. "Since the privacy expectation is strongest in the home[,] only a genuine emergency will justify entering and searching a home without a warrant and without consent or knowledge." *Id.* ¶ 26.

{21} With these principles in mind, we turn to the analysis in this case.

## 1. Nature of the Emergency

{22} *Ryon* requires us to consider the purpose and the nature of the dispatch, and the exigency of the situation based on known facts. *Id.* ¶ 32. Here, there was information that Defendant had not shown up for work for two days or called in, which was unusual, and there was a suggestion that he had recently been mixed up with drug users. Officer Chaves had information that Defendant was passed out or asleep for some extended period of time, and that someone else was with him or had been with him during the morning of June 24.

{23} The facts presented to Officer Chaves were somewhat ambiguous. There appears to be an additional avenue of investigation that Officer Chaves did not explore. Mr. Crouch knew Mr. Vasquez because he used to work for Crouch Plumbing. Officer Chaves might have explored the possibility that he could make contact with Mr. Vasquez and talk to him directly to find out more about Defendant's condition. *See id.* ¶¶ 43–44 (considering that the officers could have done additional investigation and weighing

that fact against the State). The facts are suspicious, as well. Mr. Vasquez told Mr. Crouch that Defendant was "sick" but also said Defendant was taking medication for back problems. These comments raise suspicion because it would not be normal to refer to a person suffering from back problems as "sick." It is also suspicious that Mr. Vasquez denied Mr. Crouch permission to go inside to check on Defendant. The precise nature of the problem with Defendant was unclear, but the evidence raises legitimate questions about Defendant's situation and even a suspicion of possible criminal activity. Based on the limited facts available, Officer Chaves surmised that Defendant was suffering from sleep deprivation from methamphetamine use or a possible overdose.

### a. Sleep Deprivation

{24} On the facts available, Officer Chaves thought that Defendant might be suffering from sleep deprivation caused by methamphetamine use. In addition to this being somewhat speculative on the officer's part, without more explanation about this condition we cannot conclude that sleep deprivation from drug abuse constitutes an emergency as contemplated under *Ryon.* These circumstances do not meet the requirement that Defendant was "in need of immediate aid to avoid great bodily harm or death." *See id.* ¶ 42.

### b. Drug Overdose

{25} Officer Chaves' other theory was that he was dealing with a possible overdose. The district court relied on the theory that Defendant may have overdosed and therefore quick medical attention could save his life. We cannot agree that the State sufficiently developed the record to permit such an inference.

{26} Officer Chaves based this theory on the fact that Defendant had been asleep for a long time. This information alone, however, is not sufficient to lead to a rational inference that Defendant was suffering from a drug overdose requiring emergency intervention. We also consider the inference flawed because the officer did not articulate any specific details supporting his drug overdose theo-

ry. When the court gave the officer a chance to explain his reasons for entering, asking him if he was concerned about "illness or something wrong," Officer Chaves answered, "Other than something maybe with his drug use I can't tell you if he was injured or hurt or anything, no sir."

{27} We conclude that the State's presentation was devoid of specific and articulable facts necessary to rationally support a conclusion that there was a drug overdose or other condition requiring immediate intervention. *See* LaFave, *supra*, § 6.6(a), at 452 (stating that the officer must be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant the intrusion). On this record, the officer's conclusion is unsupported and unexplained, and we conclude that the State's evidence is too tenuous and speculative to establish a circumstance of a likely drug overdose. Speculation and conjecture are insufficient to establish "an emergency at hand and an immediate need for [police] assistance." *Ryon*, 2005–NMSC–005, ¶ 29, 137 N.M. 174, 108 P.3d 1032 (internal quotation marks and citation omitted). We agree, in the abstract, with the district court's comment that people die from drug overdoses and that if they are found soon enough medical personnel might be able to save them. Although there may be cases in which officers have sufficient information to support a conclusion that a person inside a residence is suffering from a drug overdose and immediate intervention is required, this record does not support such a conclusion.

{28} We recognize that officers in the field are confronted with a wide variety of situations in which the welfare of an occupant of a residence may be in question. There may be an element of uncertainty and the facts may not be entirely clear. In some situations, danger may be more apparent; police may hear screams, or threats of violence, and the need for immediate intervention may be more readily apparent. *See, e.g., State v. Drennan*, 278 Kan. 704, 101 P.3d 1218, 1232–33 (2004) (holding entry was justified where police knew of prior history of domestic violence between the defendant and his live-in girlfriend, a neighbor reported hearing an argument, a woman scream, and then silence, no one responded when the officer knocked at the door, and when the defendant finally appeared he was unresponsive to questions and refused to say where his girlfriend was). *See generally* LaFave, *supra*, § 6.6(a), at 458–59 n. 28 (collecting cases). There may also be tangible evidence suggesting serious bodily injury or serious illness requiring immediate attention. *See id.* But this case does not present those facts. Rather, the evidence is consistent with Officer Chaves' initial assessment that the situation involved someone suffering from sleep deprivation resulting from methamphetamine use, which, we assume, was an assessment different from drug overdose. This is insufficient to establish an emergency. And, as we have discussed, the evidence does not permit a rational inference that Defendant was suffering from a drug overdose circumstance that required immediate intervention.

## 2. Available, Feasible, and Effective Alternative

{29} In addition to considering the nature of the emergency, we also consider "the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished." *Ryon*, 2005–NMSC–005, ¶ 32, 137 N.M. 174, 108 P.3d 1032 (internal quotation marks and citation omitted). Here, we are persuaded that there was an available, feasible, and effective alternative to the officer entering the home when he did. A family member was present with a key to the home and able, along with two other family members, to go inside immediately and determine Defendant's condition. Officer Chaves could have remained outside, available to enter if needed, and able to summon an ambulance if necessary. In fact, he testified that his plan was to do just that—to stand by while Defendant's aunt went inside.

{30} We can conceive situations in which it would be reasonable and permissible for an officer to enter a residence even when family members are readily available, but we do not think this was such a situation. The evidence indicates that Ms. Urias intended to enter of her own accord and there was no

72

evidence that she would have been in danger entering the home. Where, as here, a family member is available and willing to enter and to check on the condition of a relative, there is no harmful delay likely to occur in pursuing that course, and the situation does not appear to be dangerous, but is, instead, ambiguous and unclear as to imminent danger, we conclude that having an officer stand by while the family member enters is a feasible and effective alternative to police entry.

{31} We realize that police officers must make important and sometimes split-second decisions that may have to be based on less information than the officers would like. We do not mean to underestimate the difficulty of making such decisions, and we do not intend to unreasonably hamstring the discretion that must be exercised by police officers operating in good faith to address the wide variety of scenarios that may arise under the emergency assistance doctrine. We emphasize that emergency assistance cases will turn on their individual facts, and that even slight changes in the facts may distinguish one case from another. However, *Ryon* makes it clear that the burden to demonstrate an emergency is high. *See id.* ¶ 27 (requiring a "strong sense of an emergency"); ¶ 31 (stating that "[t]he objective standard for a warrantless and non-consensual entry into a home ... requires a higher degree of urgency than [*State v. Nemeth*, 2001-NMCA-029, 130 N.M. 261, 23 P.3d 936] may have conveyed"). This standard is high because it reflects the bedrock constitutional principle that a warrantless entry into a home presents unique concerns. *See id.* ¶ 22. Here, the State did not meet its burden to justify entering the home without a warrant. Defendant's family members were present, had a key to the home, and could check on Defendant without any delay, and urgency of the situation requiring police entry was not sufficiently developed. Consequently, we hold that the State failed to justify the warrantless entry by Officer Chaves.

### 3. The Officer's Motivation

{32} Defendant also argued that Officer Chaves' motivation for entry was a criminal investigation and therefore the emergency assistance doctrine would not apply. Because we have already decided in Defendant's favor, we need not address this argument.

### CONCLUSION

{33} The denial of Defendant's suppression motion is reversed.

{34} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge and CYNTHIA A. FRY, Judge.