This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                              **No. 34,171**

**TEDDY MACK REESER,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Drew D. Tatum, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Elizabeth Ashton, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**SUTIN, Judge.**

{1}     Defendant Teddy Mack Reeser was convicted of one count of aggravated driving while under the influence of intoxicating liquor and/or drugs (fifth), contrary to NMSA 1978, Section 66-8-102(D) (2010, amended 2016) (aggravated DWI).[1] Defendant asserts three arguments on appeal: (1) the district court erred in finding that the emergency assistance doctrine justified a warrantless entry into Defendant's home and in denying his motion to suppress; (2) fundamental error occurred because the aggravated DWI jury instruction omitted the requirement that Defendant's blood alcohol content (BAC) came from alcohol consumed before or while operating a vehicle; and (3) the evidence was insufficient to establish that Defendant drove his vehicle while intoxicated. Although not an argument for reversal, Defendant also requests that a typographical error in his judgment and sentence be corrected to accurately show that he was convicted of aggravated DWI based on his high BAC level, not on the basis that he refused to submit to a test under the Implied Consent Act.

**BACKGROUND**

{2}     Sergeant Michael Brockett, with the Curry County Sheriff's Office, testified at the motion to suppress hearing that he was dispatched to Defendant's residence south

[1] Defendant was also convicted of one count of driving while license is revoked, contrary to NMSA 1978, Section 66-5-39 (1993, amended 2013), however, he is not appealing that conviction.

2

of Clovis, New Mexico on April 27, 2012, at approximately 6:13 p.m. He overheard on his police radio that there had been a car crash with injuries. Shortly after hearing about the crash on his radio, dispatch advised that a green[2] pickup involved in the crash was seen leaving the area, and further provided a license plate number. Dispatch ran the license plate and obtained an address.

{3} Sergeant Brockett heard the address and responded. He did not know the extent of the injuries from the crash but was aware that both the police department and the fire department had been notified of the accident. When Sergeant Brockett arrived on scene, officers from the Clovis Police Department, Sergeant John Howard and another officer, were already there. Sergeant Brockett approached the pickup believed to be involved in the crash and noticed shoe prints leading from the driver's side of the pickup to the front of the vehicle. Sergeant Brockett admitted that he observed no blood and that the pickup had no broken windows. However, he testified that based on the shoe prints he observed, he thought there had been a scuffle. He also stated that the prints looked as if someone had fallen. Amongst the prints, he also observed a pair

---

[2] Although Sergeant Brockett testified that dispatch stated the pickup was green, the testimony of the other individuals involved in the accident, the testimony of a sergeant with the Clovis Police Department, and the trial testimony of Sergeant Brockett indicated that the at-issue pickup was gray or silver. Sergeant Brockett testified at trial that the discrepancy was related to the fact that the truck appeared green at dusk.

of glasses laying on the ground. After noting the prints and the glasses, he followed the prints that led to the front porch of a residence.

{4} He knocked on the side of the mobile home but got no response. He then checked to see if the door was locked, which it was, and then he knocked on the front door. When he knocked on the front door, the door opened, possibly because the locked door was not fully closed. When the door opened, Sergeant Brockett noticed Defendant lying on the floor. Sergeant Brockett stated that Defendant's feet were toward Sergeant Brockett, Defendant's shirt was pulled up over his upper torso, and Defendant's hands were trapped inside his shirt. Upon seeing Defendant, Sergeant Brockett called out several times and identified himself as a deputy sheriff; there was no response from Defendant. Sergeant Brockett testified that Defendant appeared to be struggling inside his shirt, and at that point, Sergeant Brockett entered the residence to assist Defendant. Sergeant Brockett admitted that he did not know what injuries Defendant might have sustained at that point but stated that Defendant may have been seizing and looked to be experiencing a medical emergency. Sergeant Brockett stated that he entered the residence because he was concerned with Defendant's welfare, having seen Defendant lying on the floor unresponsive and trapped in his shirt, and knowing that there had just been a crash, there were shoe prints outside of the residence, and glasses on the ground that suggested Defendant had fallen.

**{5}** After entering the residence, Sergeants Brockett and Howard helped Defendant with his shirt and asked if Defendant was okay. Defendant stated that he was okay, but Sergeant Brockett could, at that point, smell a strong odor of alcohol and noticed that Defendant seemed unsteady and could not successfully stand up. At that point, Sergeant Brockett called for an ambulance. After calling the ambulance, Sergeant Brockett asked Defendant if he had been driving a vehicle. When the ambulance arrived, Defendant indicated that he had low blood sugar and paramedics began rendering aid to Defendant. Once they determined that there was no medical emergency, the paramedics departed, leaving Defendant with Sergeant Brockett. At that point, Defendant was placed under arrest. Sergeant Brockett read the New Mexico Implied Consent Act to Defendant, who refused to provide a sample and could not stand on his own. Sergeant Brockett transported Defendant to the hospital for possible alcohol poisoning. At the hospital, Defendant was treated by staff.

**{6}** Based on Sergeant Brockett's testimony, the district court concluded that the emergency assistance doctrine justified his warrantless entry into Defendant's residence. In a well-explained letter decision issued to the parties, the district court denied Defendant's motion to suppress, and the case proceeded to trial.

**{7}** At trial, a passenger in the other vehicle involved in the crash, Rosa Garcia, testified that the crash had taken place at approximately 6:00 p.m. Ms. Garcia recalled

5

feeling a jolt, apparently from being rear-ended, she saw a pickup that was trying to go around her car. The driver of the pickup drove away, despite the Garcias' signal to the driver to pull over into a nearby parking lot. Ms. Garcia testified that the driver was an older Hispanic male with a mustache and grayish hair, and she stated that Defendant looked like the man driving the pickup that rear-ended her. Ms. Garcia's son, Jose Garcia (the driver of the vehicle in which she was a passenger), also testified that the driver appeared to be an older Hispanic male with a mustache. Ms. Garcia testified that the pickup involved in the accident was a grayish silver Chevy pickup and stated that State's Exhibit 4, a photograph of a pickup truck, looked like the truck that rear-ended her. Mr. Garcia also testified that the pickup was silver and agreed that State's Exhibit 4 looked like the pickup involved in the collision. Mr. Garcia called the police after the collision and provided the license plate number, as well as the make of the truck to police.

{8}     Sergeant Howard testified that on April 27, 2012, he responded to a crash at the intersection of Prince Street and Brady Avenue. Having been told by witnesses that the driver had fled the scene southbound on Prince, Sergeant Howard went to look for the vehicle and was able to locate a vehicle matching the description of the vehicle involved in the crash with front-end damage consistent with a crash. Upon locating the vehicle, Sergeant Howard testified that he saw shoe prints around the vehicle and

a pair of glasses, consistent with someone having fallen. The State showed Sergeant Howard State's Exhibit 4, and he identified it as a photograph of the vehicle that was the subject of his investigation. He also stated that to his knowledge the license plate on the vehicle depicted in State's Exhibit 4 matched the plate number called out by dispatch.

{9} Sergeant Howard corroborated Sergeant Brockett's testimony that there was concern that the driver of the vehicle had been injured and that when they entered Defendant's home, they saw Defendant caught in his shirt. He testified that as he and Sergeant Brockett assisted Defendant with his shirt, he noticed that Defendant's shoes matched the shoe prints beside the at-issue vehicle, and also noticed that Defendant was emitting an odor of alcohol, had bloodshot and watery eyes, and his speech was slurred. At trial, Sergeant Howard testified as to the likeness between Defendant's shoes (as depicted in a photograph taken by Sergeant Howard in Defendant's residence) and the shoe prints by the pickup. He also stated that Defendant was the only individual in the residence.

{10} Sergeant Brockett's testimony at trial was consistent with his testimony provided during the motion to suppress hearing. In an attempt to limit redundancy and for the purposes of this appeal, we note only the following additional testimony provided by Sergeant Brockett at trial. Sergeant Brockett testified that he arrived at

Defendant's property at approximately 6:28 p.m., i.e., about 15 minutes after the initial call went out that there had been a crash. Additionally, Sergeant Brockett testified that, after entering Defendant's residence, they began talking about Defendant leaving the scene of the crash, and Defendant admitted to having gone to get a sandwich. Once Defendant was taken to the hospital on suspicion of alcohol poisoning, Sergeant Brockett obtained a search warrant for a blood draw because Defendant had refused to be tested. The warrant was served at approximately 9 p.m. After having his blood drawn pursuant to the warrant, Defendant voluntarily, without being asked, told Sergeant Brockett that he had been drinking beer with friends, he knew he should not have driven, and had made a mistake. The sample taken from the blood draw was tested and ultimately revealed a BAC of 0.39.

{11}     The jury found Defendant guilty of aggravated DWI and driving with a revoked license. This appeal followed.

**DISCUSSION**

**The Emergency Assistance Doctrine**

{12}     We "review a district court's decision to suppress evidence based on the legality of a search as a mixed question of fact and law." *State v. Ryon*, 2005-NMSC-005, ¶ 11, 137 N.M. 174, 108 P.3d 1032. We view the facts in the light most favorable to the prevailing party and defer to the district court's findings of fact when supported

8

by substantial evidence. *Id.* "The legality of a search, however, ultimately turns on the question of reasonableness[,]" which we review de novo. *Id.*

{13} The Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution provide protection against unreasonable searches and seizures. This protection is particularly strong when applied to searches of an individual's home. *See State v. Ryan*, 2006-NMCA-044, ¶ 21, 139 N.M. 354, 132 P.3d 1040 ("A person's dwelling receives the highest degree of protection from unreasonable intrusion by the government[.]" (internal quotation marks and citation omitted)); *State v. Monteleone*, 2005-NMCA-129, ¶ 9, 138 N.M. 544, 123 P.3d 777 ("Among the areas afforded the greatest protection by these constitutional provisions is a person's home."). Thus, "[w]arrantless searches and seizures inside a home are presumptively unreasonable, subject only to a few specific, narrowly defined exceptions." *Ryon*, 2005-NMSC-005, ¶ 23; *see also State v. Trudelle*, 2007-NMCA-066, ¶ 14, 142 N.M. 18, 162 P.3d 173 ("A warrantless search is presumptively unreasonable, unless it falls within an exception to the warrant requirement." (internal quotation marks and citation omitted)).

{14} The exception to the warrant requirement at issue in the present case is the emergency assistance doctrine. In order to determine whether a warrantless search and seizure is justified under the emergency assistance doctrine, a three-part test is

employed. "First, the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. Second, the search must not be primarily motivated by intent to arrest and seize evidence. Third, there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *Ryon*, 2005-NMSC-005, ¶ 29 (alterations, internal quotation marks, and citations omitted).

{15} We find three New Mexico cases to be of particular use in conducting our analysis: *Ryon*, 2005-NMSC-005; *State v. Baca*, 2007-NMCA-016, 141 N.M. 65, 150 P.3d 1015; and *State v. Cordova*, 2016-NMCA-019, 366 P.3d 270, *cert. granted*, 2015-NMCERT-008, 369 P.3d 369.

{16} In *Ryon*, our Supreme Court adopted the three-part test now used in New Mexico to evaluate the use of the emergency assistance doctrine. 2005-NMSC-005, ¶¶ 29-39. In *Ryon*, the police were investigating a stabbing. *Id.* ¶ 2. During their investigation, the police acquired the name of a suspect and were told by dispatch that the suspect might have a head or face injury. *Id.* ¶¶ 2-4. When the police arrived at the suspect's house, the lights were on and the door was ajar. *Id.* ¶ 4. The police knocked on the door of the suspect's home but received no response. *Id.* Thinking it was odd for the door to be open with no one answering and allegedly looking for someone with a possible head injury, the police entered the house. *Id.* The police walked through the

10

house but did not find the suspect. *Id.* ¶ 5. They did, however, notice a small folding knife stained with blood in the kitchen sink. *Id.* Thereafter they secured the home and obtained a search warrant. *Id.*

{17}     In considering whether the warrantless entry was appropriate, our Supreme Court employed the three-part test. *Id.* ¶ 29. The Court explained that when evaluating the first factor, courts should consider (1) "the purpose and nature of the dispatch," (2) "the exigency of the situation based on the known facts," and (3) "the availability, feasibility[,] and effectiveness of alternatives to the type of intrusion usually accomplished." *Id.* ¶¶ 31-32 (internal quotation marks and citation omitted). The Court also explained that the second factor is essential because although "emergency situations can occur during a criminal investigation[,] . . . [t]he protection of human life or property in imminent danger must be the motivation for the initial decision to enter the home." *Id.* ¶¶ 35-36 (emphasis, alteration, internal quotation marks, and citation omitted). As to the third and final factor, the Court explained that "[o]fficers do not have carte blanche to rummage for evidence if they believe a crime has been committed[,]" and "[they] may do no more than is reasonably necessary to ascertain whether someone is in need of assistance . . . and to provide that assistance." *Id.* ¶ 38 (omission in original) (internal quotation marks and citations omitted). However, "[o]nce they are lawfully inside, officers may expand the scope of the intrusion, if

11

probable cause or reasonable suspicion arises[, and they] may . . . seize evidence of a crime that is in plain view or arrest a suspect if there is probable cause." *Id.* (citation omitted).

{18} Ultimately, the *Ryon* Court determined that the facts available to the officers at the time of intrusion did not "compel a conclusion that swift action was necessary to protect life or avoid serious injury." *Id.* ¶¶ 40-41. The Court held that neither the light inside the residence nor the door being ajar supported warrantless entry. *Id.* ¶ 41. Moreover, there were no facts that a crime had taken place at the residence, nor was there credible and specific information that a victim in need of assistance would be located in the residence. *Id.* ¶¶ 41-42. The Court stated that the nonspecific information that the suspect may have sustained an injury was not enough to support entry and reiterated that entry must be primarily based on concern for human life, not to apprehend a suspect or gather evidence. *Id.* ¶¶ 43-45.

{19} In *Baca*, 2007-NMCA-016, ¶ 1, a police officer entered the defendant's home after the defendant's employer and aunt expressed concerns about the defendant's welfare. The defendant had been absent from work for two days with no contact, and the information received by the police suggested a possible drug overdose. *Id.* In evaluating the *Ryon* factors, this Court considered the officer's belief that the defendant was "suffering from sleep deprivation from methamphetamine use or a

12

possible overdose." *Baca*, 2007-NMCA-016, ¶ 23. However, this Court held that the officer's speculation of sleep deprivation did not constitute an emergency under *Ryon*. *Baca*, 2007-NMCA-016, ¶ 24. Additionally, this Court held that, given the lack of specific facts regarding an immediate emergency, the officer's vague and unsupported concern that the defendant may have overdosed was not sufficiently developed to permit a warrantless intrusion. *Id.* ¶¶ 25-27. Additionally, this Court stated that the intrusion was not justified because there were family members present who were willing to check on the defendant at the time of the entry, such that there was another "available, feasible, and effective alternative" to police intrusion. *Id.* ¶¶ 29-30. Because there were insufficient facts to support the existence of an emergency and such alternatives to police entry, the Court concluded that the prosecution did not meet its burden to justify entering the home without a warrant. *Id.* ¶¶ 30-31.

**{20}** In *Cordova*, deputies entered a suspect's home after that suspect was seen fleeing the scene of a hit-and-run accident that resulted in numerous injuries and the death of a motorcyclist. 2016-NMCA-019, ¶¶ 2-4. One deputy testified that when they arrived at the suspect's home, the door was ajar, and "she heard some type of 'background noise' in the home." *Id.* ¶ 4. "She testified that she knocked and announced the deputies' presence and, upon getting no response, entered the home." *Id.* The other deputy present at the residence testified that they neither knocked nor

13

heard background noises, but that they did announce their presence. *Id.* The deputies eventually found the suspect in his bedroom and escorted him out of the home for questioning. *Id.* ¶ 5. He was ultimately prosecuted in connection with the crash. *Id.* ¶ 1. In arguing that the emergency assistance doctrine did not validate the deputies' warrantless entry, the defendant argued that the deputies lacked sufficient information to reasonably believe that he was in need of immediate assistance. *Id.* ¶ 9. This Court agreed. *Id.* ¶ 11. *Cordova* held that the only information the deputies had at the time was that the defendant's truck had been in an accident. *Id.* They did not know that the defendant was the driver of the truck or that he was at home. *Id.* There were no indications of injury, such as blood or impact evidence, to indicate that anyone in the truck had been injured. *Id.* ¶ 12. Additionally, the fact that the truck's occupants had fled indicated that the truck's occupants were not seriously injured. *Id.* This Court also stated that there were no signs at the residence of an emergency, such as sounds from the house that would have alerted the deputies that the defendant was in need of immediate aid. *Id.* ¶ 13. *Cordova* explained that the lack of specific testimony regarding the defendant's status did "not establish the requisite circumstances needed to demonstrate a legitimate emergency requiring immediate police assistance." *Id.* ¶ 14.

**{21}** In the present case, Defendant argues that the State failed to prove all three *Ryon* factors beyond a reasonable doubt. We address each factor in turn.

**1. Law Enforcement's Reasonable Belief That There Was an Emergency Requiring an Immediate Need for Assistance for the Protection of Life or to Avoid Serious Injury**

**{22}** Defendant argues that law enforcement did not have an objectively reasonable belief that action was necessary to protect him against an imminent danger to his life or limb. Defendant argues that any injury to him as a result of the crash was speculative and was insufficient to sustain a finding that there was an emergency. Defendant also points out that there was no blood at the scene of the accident, and there was not extensive damage to the pickup. Although he does not appear to dispute that he was in fact struggling with his shirt, he argues that the struggle did not indicate an emergency because he was not also bleeding, screaming, crying, or moaning in pain. He argues that if law enforcement truly believed that Defendant was experiencing an emergency, they would have called an ambulance sooner.

**{23}** We disagree with Defendant's interpretation of the facts and conclude that in this case law enforcement reasonably believed that Defendant was in need of immediate aid to protect or preserve life or avoid serious injury. *See Ryon*, 2005-NMSC-005, ¶ 29. The law enforcement officers were aware that there had been a crash with injuries. Although they were unaware of the extent of the injuries, they saw

shoe prints around the vehicle believed to have been in the crash that were consistent with a scuffle or someone having fallen, and saw a pair of glasses on the ground. Once the sergeants approached Defendant's residence, they knocked multiple times. After the door to the residence opened from the knocking, they witnessed Defendant on the floor with his arms stuck, as he struggled with his shirt. The sergeants identified themselves as law enforcement and asked multiple times if Defendant was okay, and Defendant did not respond. It was only after trying to address Defendant's situation verbally, and without success, that law enforcement entered the residence. Although they did not know the exact nature of Defendant's situation, the sergeants testified that they were concerned Defendant had suffered an injury or was having a seizure or some other medical emergency.

{24}    While we are wary of warrantless entries into a person's residence, the facts in this case support law enforcement's reasonable belief that Defendant was experiencing an emergency and in need of immediate assistance. The facts in this case are notably different from the facts in *Ryon*, *Baca*, and *Cordova*, none of which involved officers actually seeing an individual physically struggling and unresponsive. Moreover, unlike the officer who entered the residence in *Baca*, law enforcement here attempted to contact Defendant or whoever else might be inside the residence by knocking multiple times, and upon the door opening on its own and the sergeants

16

seeing Defendant, announcing their presence, and asking whether Defendant was okay. There was no testimony as to other individuals on scene that could have entered the residence in lieu of law enforcement. Thus, there were no available, feasible, and effective alternatives to law enforcement entry.

**2. The Primary Motivation for Entering the Residence**

**{25}** Defendant argues that law enforcement's primary purpose in entering his home was to pursue their criminal investigation of the accident, which they did immediately after assisting Defendant to free his arms from his shirt. In support of his position, Defendant highlights Sergeant Brockett's testimony that he went to Defendant's residence to assist in the investigation of the hit-and-run accident. He also points to Sergeant Howard examining Defendant's shoes after entering the residence and Sergeant Brockett asking Defendant if he had been drinking and driving.

**{26}** Despite Defendant's arguments, we hold that the State proved that law enforcement's primary motivation in entering Defendant's residence was "[t]he protection of human life or property in imminent danger[.]" *Ryon*, 2005-NMSC-005, ¶ 36 (alteration, internal quotation marks, and citation omitted). As noted in *Ryon*, emergency situations can occur during a criminal investigation, and thus we consider the primary motivation for the entry. *Id.* ¶¶ 35-36. In this case, although the sergeants were at Defendant's residence to investigate a hit-and-run accident, it does not appear

17

that they entered the residence in pursuit of that purpose. Once they saw Defendant on the floor, non-responsive, and physically struggling with his shirt, they entered and actually helped Defendant with his shirt. Officer Brockett again asked if Defendant was okay, and only then did Defendant respond affirmatively. Defendant tried to get up but immediately fell down and into the entertainment center and onto the floor, at which point an ambulance was called.

{27}     Although there is evidence in the record to support that law enforcement initially went to Defendant's residence to investigate a crash, there is nothing in the record to indicate that entry into the home was similarly and primarily motivated by investigative goals. This is notably different from the warrantless entry in *Ryon*, which seemed to be primarily motivated by the underlying investigation, as opposed to protection of human life. *See id.* ¶¶ 40, 45 (holding that "the facts within the entering officers' knowledge were not sufficient to elevate their primary role to that of community caretaking" (internal quotation marks omitted)). We also note that although the sergeants did appear to ask investigatory questions and take pictures of Defendant's shoes, they only did so after assisting Defendant. It was not until after rendering aid that law enforcement discovered Defendant exhibited clear signs of intoxication and then took up the criminal investigation.

**3.      Law Enforcement's Reasonable Basis to Associate the Emergency With Defendant's Residence**

18

{28} Defendant argues that the sergeants did not have a reasonable basis for associating any emergency situation with Defendant's home. He argues that although the evidence may have created an association between Defendant's residence and a potential crime, it did not create an association between the residence and a potential emergency. He argues that even if law enforcement had sufficient reason to associate Defendant's residence with an emergency upon seeing his struggle with his shirt, the sergeants should have left the residence once Defendant was free from his shirt and the emergency was abated.

{29} We do not find Defendant's position compelling. Here, law enforcement had a reasonable basis to associate the emergency with the area or place to be searched. The sergeants were directed to Defendant's residence as a location possibly associated with a vehicle involved in a crash. Once at Defendant's residence, they observed shoe prints leading from the vehicle to Defendant's front door—the pattern of which suggested that someone had fallen. This was corroborated by the pair of glasses found on the ground nearby. Upon locating Defendant, the sergeants witnessed Defendant on his floor struggling. Thus, there appeared to be an emergency taking place in Defendant's residence. The facts here are notably different from the facts in *Cordova*, where there was an absolute lack of evidence at the defendant's home indicating a genuine emergency. *See* 2016-NMCA-019, ¶ 13 (stating that there were no signs of

injury at the residence and there were no sounds from inside the house that alerted the deputies the defendant was in need of immediate aid).

{30}    Moreover, as indicated in *Ryon*, once law enforcement is inside of a residence that is directly tied to an emergency, they may expand the scope of the intrusion if probable cause or reasonable suspicion arises. 2005-NMSC-005, ¶ 38. In this case, there is no evidence that the sergeants removed items from the residence, though they did take pictures of Defendant's shoes, and did ask Defendant if he had been driving. This minor expansion was based on the fact that Defendant's shoes appeared to match the shoe prints by the pickup, and Defendant smelled like alcohol, had bloodshot and watery eyes, had slurred speech, and had significant trouble standing. In light of the discovery of Defendant's state when they entered to assist him, the additional inquiries were not inappropriate, and the sergeants did not improperly expand the scope of their search. We also note that aside from asking Defendant questions and photographing his shoes, there was no evidence that they conducted a meaningful search of any areas within the home for any criminal evidence.

**Aggravated DWI Jury Instruction**

{31}    Defendant argues that although he did not object at trial, the aggravated DWI instruction provided to the jury was in error. When a party fails to object to a tendered jury instruction, we review the issue for fundamental error. *See State v. Benally*, 2001-

NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. In reviewing a jury instruction for fundamental error, we first determine "whether a reasonable juror would have been confused or misdirected by the jury instruction" that was given. *State v. Barber*, 2004-NMSC-019, ¶ 19, 135 N.M. 621, 92 P.3d 633. Confusion or misdirection may arise from "instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Benally*, 2001-NMSC-033, ¶ 12.

{32} Defendant argues that there was fundamental error because the jury instruction used for aggravated DWI omitted the second half of the second element of UJI 14-4506 NMRA. Specifically, Defendant argues that the instruction should have required the jury to find beyond a reasonable doubt that (1) Defendant operated a motor vehicle; (2) within three hours of driving, Defendant had an alcohol concentration of 0.16 grams or more in 100 milliliters of blood and the alcohol concentration resulted from alcohol consumed before or while driving the vehicle; and (3) this happened in New Mexico. *See id.* Instead, as to the second prong, the jury was simply instructed that it must find beyond a reasonable doubt that within three hours of driving, Defendant had an alcohol concentration of 0.16 grams or more in 100 milliliters of blood. Defendant argues that by omitting the requirement that the BAC resulted from alcohol consumed before or while driving the vehicle, the instruction failed to reflect a critical component of DWI. Defendant also argues that the instruction as given was

21

erroneous because it permitted the jury to convict Defendant of conduct that is not actually illegal, i.e., having a high BAC within three hours of driving without showing that Defendant actually drove in such condition.

{33}    We agree that omitting the at-issue portion of the jury instruction was error. However, we do not believe that the error rose to the level of fundamental error. Our Supreme Court evaluated fundamental error as applied when an element was omitted from a jury instruction in *State v. Orosco*, 1992-NMSC-006, ¶¶ 12, 15, 113 N.M. 780, 833 P.2d 1146. *Orosco* held:

> The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done. Clearly, when a jury's finding that a defendant committed the alleged act, under the evidence in the case, necessarily includes or amounts to a finding on an element omitted from the jury's instructions, any doubt as to the reliability of the conviction is eliminated and the error cannot be said to be fundamental. The trial court's error in failing to instruct on an essential element of a crime for which [a] defendant has been convicted, where there can be no dispute that the element was established, therefore does not require reversal of the conviction. . . .
>
>       . . . .
>
>       . . . [W]hen the verdict of guilty is correct beyond a reasonable doubt, despite an instruction which has relieved the state of [its burden to prove beyond a reasonable doubt every element of the charged offense], reversal of the conviction does nothing to promote the interest that the rule serves. . . . [T]he purpose of the rule requiring proof beyond a reasonable doubt on each element is not served by mechanically requiring reversal even though the jury's findings, in light of the

> undisputed evidence in the case, necessarily establish that the element was met beyond a reasonable doubt.

*Id.* (internal quotation marks and citations omitted).

{34} In this case, we decline to conclude there was fundamental error because we are unconvinced that there has been a miscarriage of justice, that the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or that substantial justice has not been rendered. Defendant argues that the jury instruction, as worded, means that Defendant could be convicted of a non-existing crime, i.e., getting into a crash, driving home, and then drinking heavily for 20 minutes to the point of his BAC being 0.39. But there was no testimony provided to the jury that Defendant drank between the time of the accident and law enforcement arriving at his house. The evidence offered at trial indicated that law enforcement responded to Defendant's home and made contact with him within approximately 30 minutes from the hit-and-run accident that precipitated the investigation. Defendant's involvement in a hit-and-run accident, together with the short interval between the accident and the arrest, Defendant's extraordinarily high BAC of 0.39, and Defendant's own admissions that he had driven to get a sandwich, that he knew he should not have been driving, and had made a mistake gave rise to a reasonable inference that he had consumed alcohol prior to driving. *See State v. Mailman*, 2010-NMSC-036, ¶¶ 23-24, 26-28, 148 N.M. 702, 242 P.3d 269 (recognizing that the

23

prosecution may introduce direct or circumstantial evidence that the defendant drove while intoxicated); *see generally State v. Herrera*, 1991-NMCA-005, ¶ 20, 111 N.M. 560, 807 P.2d 744 ("The trier-of-fact may, based upon the evidence, make reasonable inferences supported by logic, common knowledge, and experience."). Given the evidence in support of the inference that Defendant consumed alcohol prior to driving and the fact that there was no evidence offered to dispute this inference, we do not conclude that the State's omission of the second part of the second element of the jury instruction was fundamental error requiring a new trial.

**Sufficiency of the Evidence**

{35} Defendant challenges the sufficiency of the evidence supporting his conviction for aggravated DWI. "In reviewing the sufficiency of the evidence, [the appellate courts] must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Gallegos*, 2009-NMSC-017, ¶ 30, 146 N.M. 88, 206 P.3d 993 (internal quotation marks and citation omitted). "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Chavez*, 2009-NMSC-035, ¶ 11, 146 N.M. 434, 211 P.3d 891 (alteration, internal quotation marks, and citation omitted).

{36} In order to convict Defendant of aggravated DWI, the State was required to prove beyond a reasonable doubt that Defendant drove "a vehicle in this state with an alcohol concentration of [0.16] or more in [his] blood or breath within three hours of driving the vehicle and the alcohol concentration results from alcohol consumed before or while driving the vehicle[.]" Section 66-8-102(D)(1); *see* UJI 14-4506. Defendant specifically argues that (1) the State failed to produce sufficient evidence that he was driving the vehicle involved in the crash, and (2) the State failed to show that Defendant drove his vehicle in an intoxicated state.

{37} We disagree that there was insufficient evidence to convict Defendant of aggravated DWI. In this case, there was eyewitness testimony that the driver of the pickup involved in the crash looked like Defendant. The witnesses described the physical characteristics of the pickup and identified a picture of Defendant's pickup as looking like the pickup involved in the crash. Immediately after the crash, one of the witnesses reported the license plate of the pickup involved in the crash to authorities, and law enforcement was able to tie that plate to Defendant's address. Sergeant Howard identified an image of Defendant's truck as being the subject of the investigation and indicated that it had front-end damage consistent with a crash. The testimony indicated that there were shoe prints leading from the truck to Defendant's trailer, that Defendant's shoes matched the prints outside of the truck with the front-

25

end damage, and that Defendant was the only person in the home. This testimony was bolstered by Defendant's own admissions that he had been drinking, had gone to get a sandwich, and knew he should not have been driving. In light of this testimony, there was sufficient evidence for the jury to find that Defendant was driving the pickup and that that pickup was involved in the crash.

**{38}** As to Defendant's second sufficiency argument—that the State failed to show that he drove his vehicle in an intoxicated state—we are similarly unconvinced. The facts relied upon in resolving the jury instruction issue earlier in this Opinion also apply here. Given the testimony regarding Defendant's physical state approximately 30 minutes from the time of the crash and given Defendant's highly elevated BAC within three hours of the crash, the evidence supports a reasonable inference that Defendant had consumed alcohol prior to driving and that Defendant drove his vehicle in an intoxicated state. Although defense counsel inferred at trial that Defendant could have gotten intoxicated in the time between driving and the sergeants' arrival, there was no testimony offered at trial to support that inference, and the jury was free to adopt the State's version of events instead of Defendant's. The jury was at liberty to find, as it did, that the State's evidence was sufficiently compelling to support a conviction. *See generally State v. Armijo*, 2005-NMCA-010, ¶ 4, 136 N.M. 723, 104 P.3d 1114 ("[I]t is for the fact-finder to evaluate the weight of the evidence, to assess

the credibility of the various witnesses, and to resolve any conflicts in the evidence; we will not substitute our judgment as to such matters.").

**Administrative Error**

{39} Defendant's judgment and sentence reflects a conviction under Section 66-8-102(D)(3) (aggravated refusal). Defendant requests that we order his judgment and conviction be corrected to accurately reflect that Defendant was convicted under Section 66-8-102(D)(1) of aggravated DWI based on his high BAC level, as opposed to his refusal under the Implied Consent Act. Defendant states that it is appropriate to amend the judgment and conviction because it currently includes a typographical error. *See, e.g.*, *State v. Gutierrez*, No. 29,004, 2009 WL 6560310, mem. op. ¶ 1 (N.M. Ct. App. July 31, 2009) (non-precedential) ("[A]lthough we affirm [the d]efendant's convictions, we remand to the district court for correction of a typographical error in the judgment and sentence.").

{40} We agree that the typographical error here should be corrected. Although Defendant refused to submit to a chemical test under the Implied Consent Act, which could have been used to support a conviction for aggravated DWI, *see* § 66-8-102(D)(3), the State pursued aggravated DWI on the grounds that Defendant's BAC was well above 0.16, which relies on a different subsection within the DWI statute. *See* § 66-8-102(D)(1). The jury in this case was instructed on and convicted Defendant

27

on the basis of an elevated BAC theory. The jury was never instructed as to the refusal theory. We agree that the judgment, as worded, inaccurately reflects the grounds for Defendant's conviction. We therefore order that the judgment, sentence, and commitment be amended to reflect Defendant's conviction for aggravated DWI based on his BAC level pursuant to Section 66-8-102(D)(1), as opposed to aggravated DWI based on refusal pursuant to Section 66-8-102(D)(3).

**CONCLUSION**

{41}    We affirm the district court's denial of Defendant's motion to suppress, and we affirm Defendant's conviction for aggravated DWI (fifth). However, we remand to the district court to amend the judgment so that it accurately reflects the basis for Defendant's conviction as outlined in this Opinion.

{42}    **IT IS SO ORDERED.**


_____

**JONATHAN B. SUTIN, Judge**


**WE CONCUR:**


_____

**LINDA M. VANZI, Judge**

28

_____
**J. MILES HANISEE, Judge**